# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 11, 2017 Session

## ATHLON SPORTS COMMUNICATIONS, INC.
### v.
## STEPHEN C. DUGGAN ET AL.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 12-1787-III      Ellen H. Lyle, Chancellor**

_____

**No.  M2015-02222-SC-R11-CV**

_____

We granted permission to appeal in this case to address the methods by which a trial court may determine the "fair value" of the shares of a dissenting shareholder under Tennessee's dissenters' rights statutes, Tennessee Code Annotated sections 48-23-101, *et seq.*  In doing so, we overrule *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659 (Tenn. 1983), to the extent that *Blasingame* implicitly mandates use of the Delaware Block method for determining the fair value of a dissenting shareholder's stock.  We adopt the more open approach espoused in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 712-13 (Del. 1983), in which the Delaware Supreme Court departed from the Delaware Block method and permitted trial courts to determine fair value by using any technique or method that is generally acceptable in the financial community and admissible in court.  This approach allows trial courts to utilize valuation methods that incorporate projections of future value, so long as they are susceptible of proof as of the date of the corporate action and not the product of speculation.  In this dissenters' rights case, the defendant minority shareholders were forced out of the corporation as a result of a merger, and the corporation petitioned the trial court to determine the fair value of the minority shareholders' stock.  Both parties presented expert testimony regarding the valuation of the dissenting shareholders' stock, and both experts assumed that *Blasingame* required use of the Delaware Block method to value the stock.  However, both experts also valued the dissenting shareholders' stock under more modern approaches, such as the discounted cash flow method.  After a bench trial, the trial court discredited the testimony of the dissenting shareholders' expert and credited the testimony of the corporation's expert.  The trial court's order indicates that it may have based its decision on the premise that *Blasingame* compelled use of the Delaware Block method to determine stock value.

Consequently, we remand to the trial court to reconsider its determination on valuation in light of our decision to partially overrule *Blasingame*.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of Court of Appeals Reversed; Judgment of Trial Court Vacated; Case Remanded to Trial Court**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

John R. Jacobson and W. Russell Taber III, Nashville, Tennessee, for the Defendant/Appellants, Stephen C. Duggan, Daniel R. Grogan, and Robert Kelly Grogan.

Paul S. Davidson and Laura P. Merritt, Nashville, Tennessee, for the Plaintiff/Appellee, Athlon Sports Communications, Inc.

# OPINION
## FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff/Appellee Athlon Sports Communications, Inc. ("Athlon"), was formed in 1967 and incorporated in 1972. It is a private, closely-held corporation with its principal place of business in Nashville, Tennessee. Athlon publishes special-interest consumer sports magazines, websites, and other branded products, including sports annuals, newsletters, and handbooks. It also sells authenticated sports memorabilia to consumers and wholesale clients. For over fifty years, Athlon enjoyed steady profits until it fell victim to the global economic downturn of the late 2000s.[2] *In re Fannie Mae 2008 Securities Litigation*, 742 F. Supp. 2d 382, 391 (S.D.N.Y. 2010) (describing the "well documented" events surrounding the Great Recession).

---

[1] The trial court made thorough, detailed factual findings in its decision below, which were quoted at length by the Court of Appeals. *See Athlon Sports Commc's, Inc. v. Duggan*, No. M2015-02222-COA-R3-CV, 2016 WL 6087667, at *2-*9 (Tenn. Ct. App. Oct. 17, 2016) (hereinafter referred to as "*Athlon Sports*") (quoting trial court decision), *appeal granted* (Tenn. Mar. 9, 2017). In this opinion, we include only a broad summary of the facts to give context to the analysis of the legal issues.

[2] According to an April 2010 valuation of the company, Athlon's "sales were flat for the years ended September 30, 2006 through 2008; however, sales fell by approximately 31% from the year ended September 30, 2008 to 2009. Operating profits fell substantially from the year ended September 30, 2008 to 2009 due to the sharp decline in revenues contrasted with stable fixed costs."

- 2 -

Defendant/Appellant Stephen Duggan is a certified public accountant and an executive with magazine publishing experience.[3] After learning of Athlon's financial difficulties, Mr. Duggan conceived a turnaround plan for the company. He proposed a monthly sports publication called "*Athlon Sports*," which would be inserted and distributed in newspapers. Like Athlon's other sports publications, the proposed insert would generate revenues through advertising sales.

In March 2010, Athlon accepted Mr. Duggan's proposal and hired him to implement the *Athlon Sports* newspaper-insert project. In addition, Mr. Duggan invested $1.5 million in the company and in return received 15% of the company's ownership shares, or 222,100 shares of Athlon stock. He was also eligible to receive additional shares of restricted stock amounting to an additional 10% ownership in Athlon; the number, timing, and vesting of the restricted shares were based upon EBITDA (earnings before interest, taxes, depreciation, and amortization) performance targets from 2010 to 2014.[4]

Around the same time, Athlon retained a CPA firm, Lattimore Black, Morgan & Cain ("Lattimore Black"), to conduct a valuation of Athlon. The valuation was obtained in part to establish a basis price for Mr. Duggan's restricted shares for tax purposes. The valuation was intended to be available for other purposes as well, since there had been no valuation of Athlon since its business began to decline.

In a report dated April 22, 2010, Lattimore Black placed Athlon's enterprise value at $8.1 million. It determined that the fair market value of Athlon's common share equivalents was $1.85 per share, and the fair market value of the restricted stock was $.98 per share.[5] Lattimore Black's valuations were based in part on probability estimates of the success of the *Athlon Sports* project.

---

[3] The trial court stated: "Mr. Duggan is a sophisticated, experienced and knowledgeable investor, and [an] analyst of companies and their operations and finances." *Athlon Sports*, 2016 WL 6087667, at *4 (quoting trial court decision).

[4] The Restricted Stock Award Agreement shows that Mr. Duggan's potential award was 131,732 shares of restricted stock.

[5] These values were based, to some extent, on Athlon meeting its projected goals over the next several years.

Over the next several months, Athlon secured the new infrastructure necessary to support the *Athlon Sports* newspaper-insert project. It found a manufacturer for the insert, negotiated contracts, and made other preparations for the new endeavor. Finally, the *Athlon Sports* launch took place in October 2010. It was a success, and *Athlon Sports* became a nationally-distributed sports magazine with a monthly rate base of 7 million copies. During 2011, while Mr. Duggan was still President and CEO, the *Athlon Sports* rate base grew to over 9 million copies per month, a figure that was touted in Athlon company documents. Media Industry Newsletter named Mr. Duggan 2011 Publisher/CEO of the Year.

Unfortunately, the increased circulation and other successes did not translate into higher advertisement revenue for Athlon; the ad revenue lagged substantially behind pre-launch projections. This precipitated a significant cash-flow shortfall for Athlon.

To raise the capital necessary for payroll and other operating expenses, Athlon was forced to take extraordinary measures. By October 2011, a year after the launch of *Athlon Sports*, Athlon had sold its main asset—the building that had housed the business for twenty years—for about $3.9 million. The building had served as the collateral for Athlon's approximately $1 million line of credit, so the proceeds of the sale were used to pay off the line of credit. The remaining proceeds of the building sale were retained for working capital and to fund the ongoing business. All of Athlon's key employees, except Mr. Duggan, took pay cuts.[6] As a further measure, Athlon surrendered its key-man life insurance policies on seventy-five-year-old Spencer Hays, the chairman of the board and controlling shareholder. This decision relieved the company from the obligation of paying the hefty insurance premiums and also allowed it to recover the cash value of the policies.[7]

The parties dispute whether Mr. Duggan was hindered from pursuing outside capital to address Athlon's cash flow issues during early 2011. Regardless, it is undisputed that, beginning in October 2011, Mr. Duggan was permitted to do so.

In connection with his effort to seek outside capital, Mr. Duggan oversaw the preparation of a Confidential Information Memorandum (CIM) for Athlon to use to

---

[6] Spencer Hays, the chairman of the board and controlling shareholder, had actually refused compensation from Athlon for several years.

[7] Athlon had already borrowed over $500,000 against the cash value of the life insurance policies, so the amount of capital actually realized from the liquidation of the policies is unclear in the record.

- 4 -

attract would-be investors. In the CIM, the projections for Athlon's future were quite optimistic: "Based on the investments made since 2010, Athlon is poised for strong multi-year double-digit revenue growth." The CIM also asserted that Athlon was "forecasted to generate total revenue of $14.3 million in fiscal 2012, which represents year-over-year growth rate of 34.6%." Despite these rosy forecasts, the record shows that, by the time the CIM was prepared, Athlon's financial circumstances had deteriorated substantially.

On November 28, 2011, at a board of directors meeting, Athlon effectively terminated Mr. Duggan's employment. Mr. Hays asked Mr. Duggan to resign as CEO of Athlon, and Mr. Duggan did so. However, after resigning from his employed position, Mr. Duggan remained on Athlon's board of directors.

Around that same time, Mr. Hays, along with Charles Allen (chief operating officer) and Mary Dunn Vanderkooi (chief financial officer), formed an Ad Hoc Strategic Alternatives Committee ("the Committee") to explore options for returning Athlon to profitability. The Committee devised a so-called "Plan of Merger" to form a new corporation. Under the merger plan, Athlon would merge with a newly-created Tennessee corporation, Athlon Merger Subsidiary, Inc. ("Merger Sub"). Another newly-created Tennessee corporation, Athlon Acquisition, Inc. ("Newco"), would be the sole shareholder of Merger Sub. After completion of the planned merger, the separate Merger Sub would cease to exist, leaving the Newco, also referred to as "New Athlon," as the only surviving corporation. Shares in New Athlon would be purchased via proportional investments by Mr. Hays and certain other Athlon employees. Under the merger plan, the total investment in the new corporation was expected to be $2 million, which was to provide a much-needed infusion of capital for New Athlon's ongoing business.

The Plan of Merger contemplated that some Athlon shareholders would not be invited to participate in the new corporation.[8] For this reason, the Committee anticipated that some shareholders would dissent from the planned merger. Accordingly, for the purpose of determining the value of dissenting shareholders' stock, the Committee sought a new valuation of Athlon prior to the planned merger. The Committee retained Michael Collins at 2nd Generation Capital, an investment firm in Nashville, Tennessee, to perform the valuation.[9]

---

[8] According to some evidence, only shareholders who were employees of Athlon were invited to participate in the new corporation.

[9] The record reflects that Mr. Collins was retained around December 2011.

Mr. Collins completed his valuation of Athlon by February 29, 2012. In it, Mr. Collins opined that the fair market value of the company was "$NIL," meaning zero. Mr. Collins also rendered a fairness opinion. In his fairness opinion, he recommended that all shares of Athlon stock not converted into shares of the new corporation be canceled and that the owners of those shares be compensated at the rate of 1¢ per share.

During March 2012, the Athlon board of directors convened three times. Over the course of those meetings, Mr. Collins presented his valuation of Athlon, and Mr. Hays presented the Plan of Merger. Initially, Athlon offered the recommended 1¢ per share to those not participating in the new corporation, but this was ultimately increased to $.10 per share. Mr. Hays' proposed Plan of Merger was accepted by the board.[10]

Mr. Duggan was not invited to participate in ownership of the new corporation. Along with Mr. Duggan, the other Defendants/Appellants in this appeal, minority shareholders Daniel R. Grogan and Robert Kelly Grogan, were also not invited to participate in the new corporation.[11] Although the plan was not described as a "squeeze out" or "take out" merger, this was in fact its effect on Mr. Duggan and the other shareholders who were not invited to participate in the new corporation.[12]

On August 10, 2012, the planned merger was consummated. Pursuant to the Tennessee dissenters' rights statutes, Tennessee Code Annotated sections 48-23-101, *et*

---

[10] Mr. Duggan had made a counter-proposal in which he offered to buy Athlon for as much as $.25 per share. None of the other board members supported the counter-proposal.

[11] Brothers Dan and Kelly Grogan were pioneers in the Fantasy Football industry. They formed Grogan Sports, Inc., through which they sold an informational publication to Fantasy Football enthusiasts. In January 2006, Athlon purchased the Grogans' business by giving the Grogans Athlon stock—each of them received $175,000 in Athlon stock, priced at $12.85 per share, plus $50,000 in cash to enable the Grogans to pay taxes on the stock. They were hired by Athlon, and they were each given a performance bonus in shares of stock, 198 shares valued at $12.85 per share. They were also permitted to purchase 1,000 more shares at $12.85 per share, all before 2008. The Grogans resigned from Athlon in March 2010.

[12] "The take-out merger is a device by which majority shareholders can obtain the entire proprietary interest of a corporation and force minority shareholders to take payment for their shares." Rand D. Richey, Note, *Balancing the Rights of Majority and Minority Shareholders in Take-Out Mergers: Trends in Delaware Law*, 25 New Eng. L. Rev. 699, 703 (Winter 1990).

*seq.*, Athlon was required to compensate Mr. Duggan, the Grogans, and the other non-participating shareholders for the fair value of their shares.

In October 2012, Mr. Hays, on behalf of Athlon, sent the dissenting shareholders a fair value payment check for $.10 per share plus interest. Mr. Duggan and the Grogans, rejected the offer and demanded $6.18 per share.[13] *See* Tenn. Code Ann. § 48-23-209 (2012). Their demand was rejected. After reaching an impasse, Athlon filed the instant lawsuit against Mr. Duggan and the Grogans[14] for judicial appraisal of "the fair value of the shares and accrued interest" as of the date of the merger pursuant to Tennessee Code Annotated section 48-23-301 (2012).[15]

The matter was tried before the Honorable Ellen Hobbs Lyle over the course of six days in August and September 2015. The only issue at trial was the fair value of Athlon stock at the time of the August 2012 merger.[16]

The trial court heard testimony from several lay witnesses on Athlon's operations and the events leading up to the merger. The witnesses included Mr. Allen and Ms. Vanderkooi, as well as Mr. Duggan and the Grogans. In connection with the witnesses' testimony, about 160 exhibits were submitted. The primary evidence, however, was the testimony of the parties' competing experts. They testified extensively on the fair value of Athlon stock at the time of the merger, and presented detailed reports and exhibits as well.

The valuation expert hired by Athlon in advance of the merger, Mr. Collins, gave expert testimony on behalf of Athlon.[17] In his Trial Report and his testimony, Mr.

---

[13] Mr. Duggan was paid for the stock he purchased plus the stock he would have received in incentives, a total of 353,832 shares of Athlon stock, about 21.43% of the total number of Athlon shares. The Grogans owned a much smaller amount, about 8,000 shares of stock each, which amounted to about .54% of the total shares of Athlon stock.

[14] Initially, another minority shareholder, Mark A. Miles, was included in this lawsuit as a defendant. The trial court granted Mr. Miles' *pro se* motion to dismiss because he formally withdrew his protest to the share valuation.

[15] Pursuant to section 48-23-301, if a dissenting shareholder and the corporation do not agree on fair value, "the corporation shall commence a proceeding . . . and petition the court to determine the fair value of the shares and accrued interest." Tenn. Code Ann. § 48-23-301(a) (2012 & 2017 Supp.).

[16] The dissenting shareholders did not file counterclaims against Athlon.

Collins explained the methodologies he employed, the evidence he considered, and the assumptions he made in forming his expert opinion on the fair value of Athlon stock. He relied to a great extent on the valuation he performed for Athlon in February 2012, updated to the time of the August 2012 merger. Regarding the valuation methodologies used, Mr. Collins' Trial Report stated:

> I have employed the Delaware Block Method of valuation compliant with the requirements of TENNESSEE CODE ANNOTATED Title 48 Corporations and Associations For-Profit Business Corporations Chapter 23 Dissenters' Rights and relevant Tennessee court precedents. Plaintiff's counsel assisted my familiarization with the applicable law, regulation[s], rules, and other relevant legal principles. . . .
>
> . . . .
>
> In conducting my work, I have applied the Delaware Block Method as required; and have also separately considered (and applied where I determined them to be applicable and their results reasonable without resorting to undue speculation) multiple techniques or methods that are generally considered acceptable in the financial community and appraisal profession considering all relevant factors. I present these multiple approaches in order to best inform the [Trier] of Fact and to serve as a reasonableness cross check of my calculations and opinions.

Mr. Collins' Trial Report also included a disclaimer about the Delaware Block method of valuation: "Generally accepted appraisal practice, as well as Delaware and other courts, reject the Delaware Block [method] as unreliable and not in accordance with modern valuation science." It noted the "recognized shortcoming" of the Delaware Block method, namely, that it looks to a company's historical operating results and then uses simple mathematical averaging formulas that "can yield highly misleading results," oftentimes a lower valuation for the dissenting shareholder. Modern methods of valuation such as the Discounted Cash Flow (DCF) approach, Mr. Collins' Trial Report stated, "place more emphasis on a company's future prospects to the extent that they can be reasonably forecasted without resorting to undue speculation."

---

[17] The trial court detailed Mr. Collins' extensive qualifications. *See Athlon Sports*, 2016 WL 6087667, at *5 (quoting trial court decision).

In this case, Mr. Collins concluded that the fair value of Athlon stock at the time of the merger was zero or "$NIL" under either the Delaware Block method or alternate, forward-looking, valuation methods. Mr. Collins explained that, at the time of the merger, "Athlon was insolvent or at the minimum operating in the Zone of Insolvency with unreasonably small capital. Athlon's liabilities were highly likely to exceed its assets and thus the interest of creditors as well as the equity interests would be impaired." He further opined that, "absent the external funding provided by the [merger], it would not be possible for Athlon to achieve the liquidity necessary to compensate a Dissenter." Mr. Collins felt that the DCF valuation method was "not practical, useful, or reliable when projections of future results cannot be made without resorting to undue speculation."

Expert witness Jaime C. d'Almeida testified on behalf of the dissenting shareholders about the value of their stock.[18] Mr. d'Almeida also used the Delaware Block method based on Tennessee law, even while describing that method as "not currently a common valuation method." Because the Delaware Block method is not commonly used, Mr. d'Almeida used two other valuation methods—the guideline companies method and the DCF method—to benchmark his Delaware Block method appraisal.

Under the Delaware Block method, Mr. d'Almeida valued the fair value of the dissenting shareholders' stock at $6.48 per share.[19] Using the guideline companies method, under which Athlon was compared to publicly-traded companies in similar lines of business, Mr. d'Almeida determined that the fair value of Athlon stock would be in the range of $4.55 to $9.58 per share. Under the DCF method of valuation based on Athlon's February 2012 projections, Mr. d'Almeida valued the stock at $6.48 per share. Finally, using the DCF method based on the projections included in the CIM, Mr. d'Almeida placed the fair value at $22.32 per share.

Mr. Collins submitted a Rebuttal Report in which he challenged the assumptions and methods Mr. d'Almeida used. Mr. Collins' Rebuttal Report described Mr. d'Almeida's valuation as "speculative, based on conjecture and fail[ing] to adequately support the Defendant dissenters' claim for Fair Value[,] . . . and contain[ing] numerous

---

[18] The trial court detailed Mr. d'Almeida's extensive qualifications. *See Athlon Sports*, 2016 WL 6087667, at *6 (quoting trial court decision).

[19] Mr. d'Almeida determined that the net asset value was $6.20, market value was $6.09, and earnings value was $7.16, and he assigned equal weight to each value.

- 9 -

fundamental flaws." The Rebuttal Report detailed Mr. Collins' criticisms of Mr. d'Almeida's report and his deposition testimony in a line-by-line fashion.

After closely considering the evidence, in October 2015, the trial court entered a final order in which it concluded that the fair value of the dissenting shareholders' stock at the time of the merger was "no greater than the $0.10 per share amount paid by [Athlon]." At the outset, the trial court stated, "As well explained in the trial briefs of each attorney in this case, Tennessee uses the Delaware Block method to determine fair value for dissenters." *Athlon Sports Commc's, Inc. v. Duggan*, No. M2015-02222-COA-R3-CV, 2016 WL 6087667, at *3 (Tenn. Ct. App. Oct. 17, 2016) (hereinafter referred to as "*Athlon Sports*") (quoting trial court decision), *appeal granted* (Tenn. Mar. 9, 2017). It explained: "While there is this [Delaware Block] formula under Tennessee law, the ultimate value of the stock is not formulaic. The [Delaware Block] formula is a tool to assist [in] rendering a judgment of share value customized to the unique features and facts of individual companies." *Id.* (quoting trial court decision).

The trial court specifically credited the testimony of Mr. Collins and discredited the testimony of Mr. d'Almeida.[20] *Id.* at *6-9. The trial court then outlined its reasons for finding that the fair value of the Athlon shares was no more than $.10 per share:

> The reason the Court finds the value to be $0.10 and not the zero determined by Mr. Collins is that the evidence established that Athlon's trade name had existed for 44 years and had obtained recognition. The evidence established that while this recognition was not of such an extent that it could be used as collateral or be sold for an appreciable amount or had a trademark value, it had some very, very minimal value as an intangible asset. Also, the $9 million [sic] in circulation of the Sports Insert (discussed in more detail below), the Court finds, had some very, very minimal asset value. Given the great disparity between advertising revenue, which was still insufficient, and circulation, and absence of Company assets and earnings, there was great uncertainty and risk as of the August 2012 Merger date. The Court finds there was not just a liquidity or cash flow problem; the Company was hovering around the zone of insolvency. Thus, the Court finds that the recognition of the Athlon name or brand and the [ ]9 million in circulation, while very, very minimal, provide a $0.10 per share value.

---

[20] For more a more detailed recitation of the trial court's analysis, see *Athlon Sports*, 2016 WL 6087667, at *2-*9 (quoting the decision of the trial court).

*Id.* at *6.  The dissenting shareholders appealed.

In the Court of Appeals, the dissenting shareholders argued that the trial court erred in relying exclusively on the Delaware Block method for determining the value of their Athlon shares.  The appellate court identified the dissenting shareholders' "chief objection to the Delaware Block Method" as "their claim that [the method's] focus on past rather than prospective performance is particularly unreliable for a company embarking upon a new venture like Athlon."  *Id.* at *10.  Alternatively, the dissenting shareholders argued that, even if the Delaware Block method were the proper valuation method for the shares of Athlon stock, the trial court erred in how it applied that method under the facts and circumstances of this case.  *Id.* at *9.

The Court of Appeals rejected both of those arguments.  As to the first issue, the appellate court held that "[t]he Trial Court correctly followed Tennessee case precedent in utilizing the Delaware Block Method for valuation," referring to this Court's holding in *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659 (Tenn. 1983).[21]  *Id.* at *11.  *Blasingame* adopted the Delaware Block method for determining share value in a dissenter's rights case.  *Blasingame*, 654 S.W.2d at 667.  The Court of Appeals noted that *Blasingame* adopted the Delaware Block method even though the Delaware Supreme Court that originally adopted that method had ended up criticizing it:

> Our Supreme Court's 1983 decision in *Blasingame* adopting the Delaware Block Method never has been revisited or overturned by our Supreme Court.  In *Blasingame*, our Supreme Court acknowledged the Delaware Supreme Court's decision in *Weinberger* which was critical of the Delaware Block Method, yet adopted that method nevertheless.  While the Tennessee case law available to the Trial Court and to us in the years since *Blasingame* has refined further the approach to judicial valuation, it never has departed utterly from the Delaware Block Method as a baseline.

*Athlon Sports*, 2016 WL 6087667, at *11 (referencing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 712-13 (Del. 1983)).  Based on *Blasingame*, the intermediate appellate court approved of the trial court's adherence to the Delaware Block valuation method, even though Delaware itself has "long since departed from a strict application of" that

---

[21] Another holding in *Blasingame*, unrelated to its holding on the method for determining the fair value of a dissenting shareholder's stock, was later superseded by statute, as recognized in *Wakefield v. Crawley*, 6 S.W.3d 442, 449 (Tenn. 1999).

valuation method. *Id.* at \*10. The Court of Appeals added that, "[i]f the holding of *Blasingame* . . . is to be reversed or modified by a Tennessee Court, it is the Tennessee Supreme Court that will have to do it and not this Court." *Id.* at \*11.

The Court of Appeals also rejected the dissenting shareholders' challenge to how the trial court's applied the Delaware Block method. It held that the trial court findings of fact were supported by the evidence in the record, although it agreed with the dissenting shareholders "that it seems an odd circumstance, to say the least, that forecasts made by Athlon and represented as reliable at the time are now dismissed by Athlon as unreliable." *Id.* at \*12. Regardless, the intermediate appellate court commented that the trial court was justified in lending "little or no credence to Athlon's forecasts." *Id.* Accordingly, the appellate court affirmed the trial court's decision in its entirety. *Id.*

We granted the dissenting shareholders' application for permission to appeal to address our holding in *Blasingame* and to consider whether the Delaware Block method should be the exclusive method for determining the fair value of stock held by dissenting shareholders.

**ISSUES ON APPEAL**

The dissenting shareholders first argue that the lower courts erred in holding that *Blasingame* required use of the Delaware Block method to determine the fair value of their Athlon shares. They argue that *Blasingame* did not hold that the Delaware Block method was the exclusive method for valuing shares in all dissenters' rights cases; rather, it approved that method of valuation for the specific circumstances presented in that case. If *Blasingame* did hold that the Delaware Block method was the exclusive method for valuation, the dissenting shareholders argue, it should be overruled and trial courts should be permitted to allow such valuations by any generally accepted method. Under the facts of this case, they claim, a valuation method that takes into account future profits would have led to a more fair valuation. Alternatively, if the Delaware Block method was appropriate in this case, they contend that the trial court applied it in an erroneous manner by disregarding evidence of anticipated profitability at the time of the merger.

In response, Athlon does not disagree that trial courts should not be restricted to the Delaware Block method as the only valuation method for determining fair value. Rather, it argues that any forward-looking method of valuation would yield the same result in this case, because projections of Athlon's future profits at the time of the merger were speculative and should not be considered. Therefore, Athlon maintains, under any

valuation method, the fair value of its stock at the time of the merger was zero, and the trial court's decision should be affirmed in its entirety.

## ANALYSIS

As we noted in *Keller v. Estate of McRedmond*, 495 S.W.3d 852 (Tenn. 2016), "Corporations are creatures of state law." *Id*. at 866 (quoting *Cort v. Ash*, 422 U.S. 66, 84 (1975)). Therefore, issues related to corporations are typically controlled by state law. *Id*.

"While many issues regarding corporations are governed by state statute, some issues are instead decided by the state courts." *Id*. (citing 12B Fletcher Cyc. Corp. § 5911). In this appeal, we consider the methods by which the fair value of a dissenting shareholder's stock may be determined. Tennessee's statutes do not address the methods of valuation, so that issue must be decided by this Court.

## A. Dissenters' Rights and the Appraisal Remedy

### *General*

Under the common law, fundamental corporate changes such as a merger could be implemented only upon a unanimous vote of the corporation's shareholders. This common law rule protected minority shareholders by giving veto power to any single shareholder as to such corporate changes. *See* Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo. L.J. 1, 3 (Nov. 1995) ("The nineteenth-century common law required unanimous shareholder consent before a corporation could make radical changes, such as mergers."); *Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 358 (Colo. 2003).

Over time, corporations evolved into more "democratic organizations, subject to majority rule." Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613, 613 (Feb. 1998); *Lindoe*, 63 P.3d at 358. Now, unanimous shareholder consent is not required; corporations may effect fundamental changes by majority approval.[22] Wertheimer, 47 Duke L.J. at 614. This evolution left minority shareholders "vulnerable to abuse at the hands of the majority [shareholders]," particularly in closely-held corporations. *Id* at 613.

---

[22] For a detailed account of the evolution of the appraisal remedy, see Mary Siegel, *Back to the Future: Appraisal Rights in the Twenty-First Century*, 32 Harv. J. on Legis. 79, 86-91 (Winter 1995).

"When unanimous approval was no longer required, and shareholders effectively lost their individual right to veto corporate changes, the appraisal remedy was provided to them in return." *Id.* at 614-15. The so-called appraisal remedy protects minority shareholders who dissent from certain corporate actions by allowing them to force the corporation to purchase their shares at a judicially determined price. *Id.* at 614; Michael R. Schwenk, Note, *Valuation Problems in the Appraisal Remedy*, 16 Cardozo L. Rev. 649, 649 & n.1 (1994) (citing statutes). Every state now has statutes that provide some form of appraisal remedy; these are referred to as "dissenters' rights" statutes. Schwenk, 16 Cardozo L. Rev. at 649 & n.1; *see Shawnee Telecom Resources, Inc. v. Brown*, 354 S.W.3d 542, 556 (Ky. 2011) ("Dissenters' rights statutes . . . exist in some form in every state, and in the vast majority of the states protection is accorded by an appraisal remedy . . . .").

As initially conceived, the appraisal remedy was intended to address concerns that a shareholder could be forced into continued ownership in a corporation fundamentally different from the one the shareholder had joined. Historically, the goals of the appraisal remedy were to give minority shareholders a "quid pro quo" for the loss of veto power as well as liquidity "and a 'way out' of an involuntarily altered investment." Wertheimer, 47 Duke L.J. at 615; *see also* Barry M. Wertheimer, *The Purpose of the Shareholders' Appraisal Remedy*, 65 Tenn. L. Rev. 661, 667-68 & n.32 (Spring 1998).

In modern times, the purpose of the appraisal remedy has shifted away from giving minority shareholders a "way out" of the corporation and towards protecting them from being forced out without due compensation:

> Most of the current appraisal litigation involves cash-out mergers, often instituted by a controlling shareholder. The appraisal remedy today serves a minority shareholder protection role, sometimes providing liquidity to shareholders, but most often operating to protect minority shareholders who are cashed out of their investment. The remedy fulfills this function *ex ante*, deterring insiders from engaging in wrongful transactions, and *ex post*, providing a remedy to minority shareholders who are subjected to such transactions.

Wertheimer, 47 Duke L.J. at 615-16.

Tennessee's dissenters' rights statutes can be found at Tennessee Code Annotated sections 48-23-101, *et seq.*[23]   Under Tennessee's statutory scheme, "[a] shareholder is entitled to dissent from, and obtain payment of the fair value of the shareholder's shares in the event of, . . . a plan of merger" such as the one in the instant case.[24]   Tenn. Code Ann. 48-23-102(a) (2012 & Supp. 2017).

Part 2 of chapter 23 sets forth Tennessee's procedures for the exercise of dissenters' rights.[25]   *Id.* §§ 48-23-201 –209.  Once the merger or other proposed corporate action is effectuated, the corporation must pay the dissenters "the amount the corporation estimates to be the fair value of each dissenters' shares, plus accrued interest," accompanied by certain documentation regarding its calculation of the amount paid.  *Id.* § 48-23-206 (2012 & Supp. 2017).  If a dissenting shareholder disagrees with the "fair value" paid by the corporation, the dissenter may retain the amount received and notify the corporation in writing of his own estimate of "fair value," or the dissenter may simply reject the offer and demand payment of fair value.  *Id.* § 48-23-209.  If the shareholder's demand for "fair value" remains unresolved, "the corporation shall commence a

---

[23] Title 48, chapters 11 through 27, of the Tennessee Code Annotated is known as the "Tennessee Business Corporation Act."  Tenn. Code Ann. § 48-11-101 (2012).  Chapter 23 includes the provisions on dissenters' rights.

[24] Tennessee Code Annotated section 48-23-102(a) provides:

(a)  A shareholder is entitled to dissent from, and obtain payment of the fair value of the shareholder's shares in the event of, any of the following corporate actions:

(1) Consummation of a plan of merger to which the corporation is a party:

(A) If shareholder approval is required for the merger by § 48-21-104 or the charter and the shareholder is entitled to vote on the merger if the merger is submitted to a vote at a shareholders' meeting or the shareholder is a nonconsenting shareholder under § 48-17-104(b) who would have been entitled to vote on the merger if the merger had been submitted to a vote at a shareholders' meeting; or

(B) If the corporation is a subsidiary that is merged with its parent under § 48-21-105 . . . .

[25] In the instant case, it is undisputed that there was substantial compliance with the provisions regarding requisite notices and procedures.

proceeding within two (2) months after receiving the payment demand and petition the court to determine the fair value of the shares and accrued interest." *Id.* § 48-23-301(a).

It is worth noting that dissenters' rights statutes use the term "fair value," not "fair market value." "Fair value" in this context is not the same as fair market value. *Lindoe*, 63 P.3d at 361. "Fair market value is typically defined as the price at which property would change hands between a willing buyer and a willing seller when neither party is under an obligation to act." *Id*. at 362. "However, in a dissenters' rights action, the dissenting shareholder is not in the same position as a willing seller on the open market— he is an unwilling seller with little or no bargaining power." *Id*. at 361 (citing *Swope v. Siegel-Robert, Inc*., 243 F.3d 486, 492 (8th Cir.2001)). Moreover, "'[f]air value' carries with it the statutory purpose that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value." *HMO-W Inc. v. SSM Health Care Sys.*, 611 N.W.2d 250, 255 n.5 (Wis. 2000) (quoting Joseph W. Anthony & Karlyn V. Boraas, *Betrayed, Belittled ... But Triumphant: Claims of Shareholders in Closely Held Corporations*, 22 Wm. Mitchell L. Rev. 1173, 1186 (1996)). "This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value." *Id.* Perhaps because minority shareholders in a publicly traded corporation can readily sell their shares for market value, shares that are traded on an organized security exchange are not subject to minority shareholders' right to dissent and obtain "fair value." *See* Tenn. Code Ann. § 48-23-102(c); *see also* Don S. Clardy, Comment, *Valuation of Dissenters' Stock Under the Appraisal Remedy—Is the Delaware Block Method Right for Tennessee?*, 62 Tenn. L. Rev. 285, 289 & n.24 (Winter 1995) (listing state statutes that eliminate the appraisal remedy for some publicly-traded stocks).

In Tennessee, the term "fair value" is defined by statute: "'Fair value' with respect to a dissenter's shares means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action." Tenn. Code Ann. § 48-23-101(4) (2012 & Supp. 2017). As noted above, Tennessee's dissenters' rights statutes do not specify how "fair value" price is ascertained.[26] *See Blasingame*, 654 S.W.2d at 665. When statutes do not prescribe a method for ascertaining fair value, "the

---

[26] The dissenters' rights statutes in some jurisdictions include statutory guidance on how to determine fair value. *See* Clardy, 62 Tenn. L. Rev. at 286 (noting that some statutes require courts to appoint a number of appraisers, while others grant courts the discretion to appoint appraisers). As we have indicated, Tennessee is not one of those jurisdictions.

determination of a company's value is generally left to the discretion of the courts or appraisers or both." Clardy, 62 Tenn. L. Rev. at 286.

## B.  Determining "Fair Value"

*General*

There are several methods for determining the "fair value" of a dissenting shareholder's stock.  The question of which method is most appropriate in a given case is the subject of much debate.  A review of the development of the law in this area is helpful to an understanding of the issue presented in this case.

In early years, litigation over the value of a dissenting shareholder's stock was infrequent, and the valuation methods used in such cases had little commonality.  Some courts viewed asset value or capitalized earnings of corporations as the strongest indicators of value.  Clardy, 62 Tenn. L. Rev. at 290 n. 30 (citing as examples *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 122 A. 142 (Del. Ch. 1923); *Nat'l Bank of Commerce v. City of New Bedford*, 29 N.E. 532 (Mass. 1892); *Int'l & G.N. R.R. v. Bremond*, 53 Tex. 96 (1880)).  "Other courts relied on the prices quoted on the exchange or the market price if reliable figures were available." *Id.* "[M]ost courts concluded that no single formula should be used exclusively to value dissenters' shares, but that a number of factors should be considered together." *Id.* (footnote omitted).

In 1950, the Delaware Supreme Court decided a significant case on valuation of dissenting shareholders' shares, *Tri-Continental Corp. v. Battye*, 74 A.2d 71 (Del. 1950). *Tri-Continental* is often cited for its description of what later became known as the "Delaware Block" method of valuation, also called the "the Delaware Rule" or "the weighted average method" of valuation. *See Weinberger*, 457 A.2d at 712; *see also Hubbell v. Sumner Anesthesia Assocs., Inc.*, No. M2008-01736-COA-R3-CV, 2009 WL 1162650, at *4 (Tenn. Ct. App. Apr. 29, 2009).  In *Tri-Continental*, the Delaware Supreme Court explained the valuation method in this way:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern.  By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger.  In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which

reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.

The rule as stated requires that certain obvious conclusions be drawn. Thus, since intrinsic or true value is to be ascertained, the problem will not be settled by the acceptance as the sole measure of only one element entering into value without considering other elements. For example, as was specifically held in *Chicago Corporation v. Munds*, *supra*, market value may not be taken as the sole measure of the value of the stock. So, also, since value is to be fixed on a going-concern basis, the liquidating value of the stock may not be accepted as the sole measure.

*Tri-Continental*, 74 A.2d at 72. Thus, *Tri-Continental* rejected the use of any single method for determining the value of a dissenter's shares. Instead, it required "the averaging of the three most popular methods of valuation [at the time]: market value, asset value, and earnings value." Clardy, 62 Tenn. L. Rev. at 290 & n.37 (citing *In re Delaware Racing Ass'n*, 213 A.2d 203, 209 (Del. 1965); *Sporborg v. City Specialty Stores, Inc.*, 123 A.2d 121, 124 (Del. Ch. 1956)).

Under the basic application of the Delaware Block method, an appraiser first determines the value of the subject corporation under each of the three valuation methods identified in *Tri-Continental*: (a) market value, (b) asset value, and (c) earnings value. Once these three values are ascertained, each is "multiplied by a weighted factor expressed as a percentage of the whole so that the products of the calculations[,] when added together[,] will equal one hundred percent and represent the total value of each share."[27] *Elk Yarn Mills v. 514 Shares of Common Stock of Elk Yarn Mills, Inc.*, 742

---

[27] For example, the Delaware Block method uses a formula similar to this:

Asset value      $100.00  x  50%  =  $50
Market value    $ 80.00  x  25%  =  $20
Earnings value  $   0.00  x  25%  =  $ 0

Total value per share  =  $70

- 18 -

S.W.2d 638, 640 (Tenn. Ct. App. 1987). "The weight to be given the particular values takes into consideration the type of business, the objectives of the corporation, and other relevant factors." *Id.* (citing *Blasingame*, 654 S.W.2d at 666).

From 1950 until 1983, Delaware Block was the exclusive method Delaware used to value a corporation in an appraisal proceeding. *See Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 555 (Del. 2000); *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186-87 & n.7 (Del. 1988). In 1983, however, the Delaware Supreme Court moved decisively beyond Delaware Block as the exclusive method for valuation. In the landmark case of *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983), the defendant corporation presented evidence of stock valuation using the Delaware Block method in accordance with Delaware caselaw, while the dissenting shareholder presented a different valuation using the discounted cash flow (DCF) method.[28] *Weinberger*, 457 A.2d at 712. The Court noted that, although Delaware Block had been the method used "for decades" for stock valuation, that method "excludes other generally accepted techniques used in the financial community and the courts, [and] it is now clearly outmoded." *Id.* The Delaware Supreme Court concluded, "It is time we recognized this in appraisal and other stock valuation proceedings and bring our law current on the subject." *Id.* The *Weinberger* Court held:

> [T]he standard "Delaware block" or weighted average method of valuation, formerly employed in appraisal and other stock valuation cases, shall no longer exclusively control such proceedings. We believe that a

---

[28] The discounted cash flow (DCF) method is a forward-looking valuation technique based on cash flow and earnings forecasts:

A proper DCF analysis follows a well-defined sequence:

> First, one estimates the values of future cash flows for a discrete period, based, where possible, on contemporaneous management projections. Then, the value of the entity attributable to cash flows expected after the end of the discrete period must be estimated to produce a so-called terminal value, preferably [by] using a perpetual growth model. Finally, the value of the cash flows for the discrete period and the terminal value must be discounted back using the capital asset pricing model or 'CAPM.'

*In re PetSmart, Inc.*, No. 10782-VCS, 2017 WL 2303599, at *32 (Del. Ch. May 26, 2017) (quoting *Andaloro v. -PFPC Worldwide, Inc.*, No. Civ. A. 20336, Civ. A. 20289, 2005 WL 2045640, at *9 & n.370 (Del. Ch. Aug. 19, 2005) (citation omitted)).

more liberal approach must include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court, subject only to our interpretation of [the relevant statutes and rules]. This will obviate the very structured and mechanistic procedure that has heretofore governed such matters.

*Id.* at 712-13. Thus, the Court rejected Delaware Block as the exclusive method of valuation in appraisal proceedings and paved the way for other techniques and methods. Hearkening back to the language in *Tri-Continental*, the *Weinberger* Court emphasized that "[f]air price obviously requires consideration of all relevant factors." *Id.* at 713. Specifically, it noted, facts related to "*future prospects* of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but *must be considered* by the agency fixing the value." *Id.* at 713 (emphases added by *Weinberger* Court) (quoting *Tri-Continental*, 74 A.2d at 72). However, the *Weinberger* Court cautioned against consideration of "speculative elements of value that may arise from the 'accomplishment or expectation' of the merger." *Id.* The Court elaborated:

We take this to be a very narrow exception to the appraisal process, designed to eliminate use of pro forma data and projections of a speculative variety relating to the completion of a merger. But elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered.

*Id.* Thus, *Weinberger* embraced valuation methods that take into consideration the future prospects of the subject corporation, so long as the evidence of future value did not amount to speculation.

Turning to the facts presented in that case, the *Weinberger* Court surmised that the trial court may have disregarded the plaintiff's DCF valuation based on past Delaware practice of using only the Delaware Block method. *Id.* at 714. For this reason, the Court remanded the case for reconsideration of the plaintiff's proof under the new standard. *Id.* ("While we do not suggest a monetary result one way or the other, we do think the plaintiff's evidence should be part of the factual mix and weighed as such.").

Although *Weinberger* described the Delaware Block method of valuation as "outmoded" and "mechanistic," *see id.* at 712-13, it "did not prohibit use of the Delaware block method, and this method has continued to be used in Delaware and elsewhere."

Wertheimer, 47 Duke L.J. at 628 n.82 (citing cases); *see* Note, *Using Capital Cash Flows to Value Dissenters' Shares in Appraisal Proceedings*, 111 Harv. L. Rev. 2099, 2101 (May 1998) (footnote omitted) ("[A]n examination of recent cases in the Delaware courts reveals that the Delaware Block Method is alive and well."); *see also Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985). One commentator has noted that "[l]itigants and the chancery court [in Delaware] were slow to take advantage of Delaware's new openness to a broader spectrum of financial evidence." Schwenk, 16 Cardozo L. Rev. at 666. Nevertheless, over time, many jurisdictions have recognized the limitations of the Delaware Block method and have adopted *Weinberger*'s more open approach to determining the "fair value" of a dissenting shareholder's stock. *See* Clardy, 62 Tenn. L. Rev. at 300 ("As a result of *Weinberger*'s liberalization of its valuation methods, many courts have begun to question the reliability and validity of the Delaware Block Method.").

Since *Weinberger*, to determine fair value, courts in most states will take into consideration any evidence that may be relevant, including lay and expert testimony. *In re Appraisal of Dole Food Co.*, 114 A.3d 541, 553 n.7 (Del. Ch. 2014). This led one Delaware court to comment that, "[l]ike driving, the valuation field does not lend itself to metes-and-bounds demarcations of expert-only territory." *Id.* at 553. Indeed a number of courts have observed that "those knowledgeable about valuation recognize that the field is as much art as science." *Id.* at 553 n.7 (citing *In re Shell Oil Co.*, 607 A.2d 1213, 1221 (Del. 1992) ("Valuation is an art rather than a science."); *In re Smurfit-Stone Container Corp. S'holder Litig.*, No. 6164-VCP, 2011 WL 2028076, at *24 (Del. Ch. May 20, 2011) ("[U]ltimately, valuation is an art and not a science."); Peter E. Bronstein & David A. Typermass, *Business Valuation Reports—The Importance of Proactive Lawyering*, 82 N.Y. St. B.J. 11, 12, 16 (Feb. 2010) ("[T]he appraisal process is not an exact science . . . . Business valuation is often described as part art and part science because many of the techniques used by business appraisers require the use of subjective assumptions."); Kenton K. Yee, *Control Premiums, Minority Discounts, and Optimal Judicial Valuation*, 48 J.L. & Econ. 517, 536 (2005) ("The practice of valuation is an inexact art, not a precise science."); Wertheimer, 47 Duke L.J. at 629 ("Each appraisal technique is but a way of estimating the fair value or true value or intrinsic value of a company, and undeniably, valuation is an art rather than a science." (internal quotation marks omitted)).

*Tennessee and Blasingame*

The ink on Delaware's *Weinberger* decision was barely dry when this Court issued its opinion in *Blasingame v. American Materials, Inc.*, only a few weeks later. As we

- 21 -

have already indicated, *Blasingame* formally adopted the Delaware Block method to determine the fair value of a dissenting shareholder's stock. 654 S.W.2d at 667 ("We adopt the Delaware rule requiring the use of [asset value, market value, and earnings value] in determining the fair value of a dissenting minority stockholder's shares."). The *Blasingame* Court noted that several of our sister states with similar statutes used the Delaware Block method in assessing share value. *Id.* at 665. The Court quoted extensively from *Brown v. Hedahl's-Q B & R, Inc.*, 185 N.W.2d 249, 259 (N.D. 1971), in which the North Dakota Court explained the Delaware Block method of valuation in detail. *Id.* at 665-67. It also noted that experts may consider "numerous other factors" in determining "the weight to be given each of the three methods, but the courts must make the final determination of the appropriate weight to be given each method as well as the ultimate value of the stock interest."[29] *Id.* at 667.

Interestingly, *Weinberger* was neither mentioned nor discussed in the *Blasingame* opinion. However, the *Blasingame* Court briefly acknowledged *Weinberger* in a footnote in its response to the plaintiff's petition to rehear.[30] In that footnote, the Court recognized the change in Delaware law but said that it did "not find anything in *Weinberger* that cause[d it] to alter the adoption of the weighted average method." *Blasingame*, 654 S.W.2d at 668 n.1 (response to petition to rehear).

Perhaps because of *Blasingame*'s unqualified adoption of the Delaware Block method and its dismissive footnote comment about *Weinberger*, some courts apparently perceived *Blasingame* as holding that Delaware Block is the only permissible valuation method for a dissenting shareholder's stock in Tennessee. *See, e.g.*, *Hubbell*, 2009 WL 1162650, at *4 (applying the Delaware Block method in accordance with *Blasingame*); *Elk Yarn Mills*, 742 S.W.2d at 640 (noting that "the correct method for calculating the value of the shares in this case is the Delaware Block method adopted by our Supreme

---

[29] Following *Brown*, the *Blasingame* Court outlined some general guidelines for assigning weight to the different values under the Delaware Block method. For example, "where there is an established market for the stock of a corporation[,] the market price is given great weight." *Blasingame*, 654 S.W.2d at 666 (quoting *Brown* 185 N.W.2d at 259). The asset value is given proportionally greater weight "in cases where the primary purpose of the corporation is to hold assets, such as real estate, for the purpose of allowing them to appreciate in value," and it is given less weight when the assets held are inventories that will depreciate over time. *Id.* (quoting *Brown*, 185 N.W.2d at 259). The earnings value is to be given greater weight when "the primary purpose of the business is to generate earnings and not to hold assets that will appreciate in value." *Id.* (quoting *Brown*, 185 N.W.2d at 259).

[30] The *Blasingame* Court appended its response to the petition to rehear at the end of its opinion. *Blasingame*, 654 S.W.2d at 668.

Court in [*Blasingame*]"); *see also* Wertheimer, 47 Duke L.J. at 628 n.82 (noting that Tennessee "may still insist on the exclusive use of the Delaware block method even after *Weinberger*"). Other Tennessee courts have been less definitive, sanctioning use of the Delaware Block method only after determining that the facts were well-suited to that methodology.[31] *See MS Holdings, LLC v. Malone*, No. W2006-01609-COA-R3-CV, 2008 WL 1700156, at \*2 (Tenn. Ct. App. Apr. 14, 2008) (rejecting the use of the valuation methods in *Weinberger* because the evidence of future performance was entirely speculative); *Genesco, Inc. v. Scolaro*, 871 S.W.2d 487, 490 (Tenn. Ct. App. 1993) (concluding that the Delaware block method is neither required nor prohibited when valuing preferred stock, but that its use was appropriate in the instant case); *East Tenn. Transp., Inc. v. Ketron*, No. 295, 1991 WL 28943, at \*4 (Tenn. Ct. App. Mar. 7, 1991) (affirming use of Delaware Block method and rejecting argument that the capitalized earnings method should have been used, but not based on *Blasingame*).

To be clear, *Blasingame* did not explicitly mandate the use of Delaware Block as the *exclusive* method for determining the value of a dissenting shareholder's stock. However, the assumption that this was the intent of the *Blasingame* holding is not without basis. Indeed, *Blasingame*'s decisive adoption of the Delaware Block valuation method lends itself to such an interpretation. *Blasingame*, 654 S.W.2d at 667 ("We adopt the Delaware rule requiring the use of all three methods in determining the fair value of a dissenting minority stockholder's shares.").

In the interim since *Blasingame* was decided, it has become clear that Delaware Block should not be viewed as the exclusive valuation method in dissenters' rights cases and that the view espoused in Delaware's *Weinberger* decision is the better approach to determining the value of a dissenting shareholder's stock in dissenters' rights cases. Our dissenters' rights statutes do not require any particular valuation method for a dissenting shareholder's stock, and neither should this Court.

There are now several widely-recognized valuation methods in addition to Delaware Block, a few of which were identified and applied by the experts in this case. In the trial court below, both of the parties' experts noted the unpopularity of Delaware

---

[31] The question of business valuation frequently arises in divorce cases, and in those cases Tennessee courts have not felt constrained to use the Delaware Block method. *See Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (noting that "[t]here are a number of acceptable methods available to determine the value of a corporation" and that the *Blasingame* Court identified three of them); *see also Edenfield v. Edenfield*, No. E2004-00929-COA-R3-CV, 2005 WL 2860289, at \*8-9 (Tenn. Ct. App. Oct. 31, 2005) (following *Wallace* and opining that "the court should [choose] an acceptable method [of valuation] that best fits the characteristics of the business at issue").

Block as a valuation technique. The *Weinberger* approach of giving trial courts the flexibility to choose the valuation method that best fits the circumstances is most likely to result in an equitable calculation of "fair value." We see no reason to restrict trial courts to using *only* the Delaware Block method in determining fair value.

Also militating in favor of our adoption of Delaware's *Weinberger* approach is the fact that, in matters of corporate law, Tennessee courts often look to Delaware law. *Keller*, 495 S.W.3d at 876 (adopting a Delaware ruling); *Rock Ivy Holding, LLC v. RC Props., LLC*, 464 S.W.3d 623, 635 (Tenn. Ct. App. 2014) (citing *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 409-10 (6th Cir. 2006)); *see RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 206 (S.D.N.Y.2009) (stating that "many courts—including this one—appropriately look to the views of Delaware's learned jurists when analyzing issues of corporate law"), *cited with approval in Sanford v. Waugh & Co.*, 328 S.W.3d 836, 846 n.4 (Tenn. 2010). As the Court of Appeals below recognized, Delaware has "long since departed from a strict application of the Delaware Block Method." *Athlon Sports*, 2016 WL 6087667, at *10; *see, e.g., Shawnee Telecom Resources*, 354 S.W.3d at 556 (overruling long-standing Kentucky case to the extent that it required adherence to the Delaware Block method). It is time we did so as well.[32] *See* Wertheimer, 47 Duke L.J. at 628 n.82. By following *Weinberger*, "our lawyers and our courts [will be able] to utilize the rich body of law in other jurisdictions for guidance" in determining what valuation methods would be appropriate in a given case. *Keller*, 495 S.W.3d at 876 (noting that Delaware ruling adopted had "been cited and applied in a host of other jurisdictions," quoting *Lightner v. Lightner*, 266 P.3d 539, 548 (Kan. Ct. App. 2011)).

As we have recognized, "the law must change 'when necessary to serve the needs of the people.'" *Dedmon v. Steelman*, 535 S.W.3d 431, 451 (Tenn. 2017) (quoting *Powell v. Hartford Accident & Indem. Co.*, 398 S.W.2d 727, 732 (Tenn. 1966)). "Where the reason fails the rule should not apply." *Id*. (quoting *Brown v. Selby*, 332 S.W.2d 166, 169 (Tenn. 1960)). It is time to "bring our law current on th[is] subject." *Weinberger*, 457 A.2d at 712. Given the nearly universal approval the *Weinberger* approach has won in the years since *Blasingame*, we overrule *Blasingame* to the extent that it implies that

---

[32] In his article, Professor Wertheimer observes somewhat incredulously that "at least one state, Tennessee, may still insist on the exclusive use of the Delaware block method even after *Weinberger*." Wertheimer, 47 Duke L.J. at 628 n.82 (citing *Blasingame*, 654 S.W.2d at 668 n.1 (opinion on petition to rehear)). He then comments that "Tennessee's strict adherence to the Delaware block method is certainly not mandated by statutory language," and it does not "make sense to prohibit other relevant appraisal evidence as a matter of general policy." *Id.* (citing Clardy, 62 Tenn. L. Rev. at 285 &n.3).

trial courts are allowed to use *only* the Delaware Block method of valuation. We adopt the more open *Weinberger* approach, which allows "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Weinberger*, 457 A.2d at 712-13. As in *Weinberger*, "[o]nly the speculative elements of value that may arise from the 'accomplishment or expectation' of the merger are excluded." *Id*. at 713. This exception is "designed to eliminate use of *pro forma* data and projections of a speculative variety relating to the completion of a merger. But elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered." *Id*. The Delaware Block method of valuation remains available where appropriate, but trial courts may now choose to use another valuation method to determine the fair value of a dissenting shareholder's shares of stock.

## C. Application of Holding to Facts

Given our holding that trial courts are not required to use the Delaware Block method to determine the fair value of a dissenting shareholder's stock, we must determine whether it is necessary in this case to remand for further proceedings.

In this appeal, the dissenting shareholders argue: "[T]he Trial Court's decision to rely exclusively upon the Delaware Block Method infected the entire proceeding with error. Applying the wrong standard affected how the parties to the litigation discovered evidence, how the parties' respective experts prepared their reports, and how the parties offered testimony to the Trial Court." Appellants' Brief at 32. In addition, they argue that "applying the wrong standard fundamentally altered how the Trial Court evaluated the evidence submitted by the parties." By using the "backwards-looking lens" of the Delaware Block method, the dissenting shareholders contend, the trial court "failed to account for the single best evidence of the value of Athlon's stock—its management's February 2012 forecast of profitability." *Id.* For this reason, they ask us to either (1) reverse the trial court and value their stock at $6.48 per share, as opined by their expert Mr. d'Almeida, or (2) vacate the trial court's order and remand for further proceedings or for a new trial based on modern valuation techniques.

In response, Athlon argues that a remand is not necessary because "[t]he Trial Court did not reject Dissenters' expert's DCF calculations because of some mistaken belief that it was required to mechanically apply the Delaware Block method." Rather, Athlon maintains, the trial court rejected Mr. d'Almeida's analysis under both the Delaware Block method and the more forward-looking methods because his comparisons

were flawed and the projections on which he relied were speculative. They insist that the dissenting shareholders were not limited in their discovery efforts and that the trial court did not over-rely on the Delaware Block method. Under these circumstances, Athlon argues that we should conclude that the trial court correctly credited the testimony of its expert Mr. Collins, discredited the testimony of Mr. d'Almeida, and properly valued the fair value of the dissenting shareholders' stock at $.10 per share.

To determine whether a remand is necessary, we have closely reviewed the record in this case. At the outset, the trial court's remarks indicate that it viewed *Blasingame* as having designated the Delaware Block method as the only method appropriate for use in Tennessee to determine the fair value of the dissenting shareholders' stock. *See Athlon Sports*, 2016 WL 6087667, at *3 ("Tennessee uses the Delaware Block method to determine fair value for dissenters.") (quoting the trial court, which cited *Blasingame*). The trial court then explained how the Delaware Block valuation method works to combine and weigh the three underlying approaches, the market value approach, the asset value approach, and the earnings value approach. *Id*.

After this general description of the Delaware Block method, the trial court emphasized that Tennessee law and Delaware Block required it to "take[] into account the individual circumstances of the company being valued." The trial court then went on to carefully evaluate the opinions proffered by both parties' experts. As noted above, both experts framed their opinions in part based on the Delaware Block method based on the language in *Blasingame*. However, both experts' testimony *also* included alternate opinions based on forward-looking valuation methods. The trial court closely considered the experts' assertions and underlying assumptions under the Delaware Block method and under the alternate methods as well.

After a detailed review of the evidence, the trial court decided to credit the opinion of Athlon expert Mr. Collins and reject the opinion of the dissenting shareholders' expert Mr. d'Almeida. The trial court offered an "inexhaustive but sufficient" list of the reasons for its credibility assessment. *Id.* at *7-9. As explained below, in its list of reasons, the trial court in effect dismantled the individual components of Mr. d'Almeida's analysis.

The trial court first found that the evidence in the record did not support Mr. d'Almeida's valuation of the company's assets, particularly the amounts assigned to distributor relationships and trademark value. *Id.* at *7-8. Importantly, the trial court found that Mr. d'Almeida had erred in counting Althon's net operating loss (NOL) carryovers as an asset, because the value of NOLs "is contingent upon generating future profits." *Id.* at *7. To this point, the trial court observed: "Based upon the evidence of

- 26 -

the Company's history of significant losses, its further deteriorating financial condition from 2010-2012, and the evidence of the macro decline in the publishing and print media industry, the Court finds it is speculative to assume or conclude future profits of the Company." *Id.* For a variety of reasons, the trial court also found that Mr. d'Almeida's earnings and market valuations were either erroneous or unsupported by the evidence. *Id.* at *8-9.

Portions of the trial court's assessment indicate that it rejected Mr. d'Almeida's forward-looking valuations based on the speculative nature of the evidence of future profits. The trial court first turned to the CIM and Mr. d'Almeida's valuation using the CIM contained under his Trial Report headnote "DCF Using Confidential Information Memorandum Projections." In deeming the CIM an unreliable basis for informing share value, the trial court accredited the trial testimony of Athlon experts Mr. Allen and Mrs. Vanderkooi, who described the statements in the CIM as "aspirational" and intended to attract potential investors. *Id.* at *9. The trial court explained, "[T]he CIM is not accorded weight by the Court because its hope for future profits was not in keeping with the macro conditions of the industry and the track record of the Company. The CIM was, at most, puffery." *Id.* Noting that Mr. Duggan prepared the CIM, the trial court found the CIM to be an unreliable marker of Athlon's value and declined to view it as "some sort of concession of value by the Company." *Id.*

The trial court also rejected Mr. d'Almeida's valuation set forth under the headnote "DCF Using February 2012 Projections." This valuation was based primarily on Athlon's February 2012 projections and a statement Athlon gave to Mr. Collins in response to a questionnaire submitted to Athlon during the February 2012 valuation of the company. In response to the questionnaire, Athlon stated that the "most probable outcome" of profitability would be in 2013. This statement was supported by a February 2012 "Five Year Forecast with Four year History," in which it was projected that Athlon would become profitable by 2013. The trial court characterized Athlon's statement of the "most probable outcome" as "an outlier," an "isolated statement" that was "an exception to the greater weight and preponderance of the evidence," and concluded that it did not substantially detract from the court's other findings.

On one hand, these findings seem to indicate that the trial court evaluated the evidence without regard to the method of valuation. On the other hand, the trial court cited *Blasingame* for the proposition that "Tennessee uses the Delaware Block method to determine fair value for dissenters." *Blasingame*, 654 S.W.3d at 667 (cited at p. 7 of trial court's order). Indeed, throughout its order, the trial court repeatedly referred to the Delaware Block method and its three component valuation methods. These references

may indicate that the trial court felt constrained under *Blasingame* to apply the Delaware Block method and, importantly, that it may have evaluated the evidence on valuation through this prism.[33] Since we cannot exclude this possibility based on this record, the more prudent course is to vacate the trial court's order and remand to permit the trial court to reevaluate its decision on valuation in light of our ruling on *Blasingame*.

From our careful review of the record, we see no indication that either Athlon or the dissenting shareholders were hindered from conducting discovery or from proffering expert testimony based on valuation methodologies other than the Delaware Block method. However, like the trial court, the parties may have been operating under the assumption that Delaware Block was the only valuation method available to them. On remand, the trial court is not required to permit the parties to conduct additional discovery or to allow the parties to put on additional proof, but it may choose to do so. Concomitantly, the trial court may decide, in its discretion, to reevaluate the question of valuation based on the evidence in the record as it now stands. We leave these decisions to the sound discretion of the trial court on remand.

---

[33] For example, on pages 7-9 of the order, the trial court described how to apply the Delaware Block method and stated, "In these ways, the Delaware Block formula Tennessee uses takes into account the individual circumstances of the company being valued. Accordingly, . . . the Court turns to the evidence . . . to make those findings and determine the outcome for valuing the Company's stock under Tennessee law." On page 14, the trial court indicated that its findings of fact "inform[ed] valuation under the Delaware Block Method." On page 16, after outlining the Delaware Block calculations of both experts, the trial court stated: "As to these varying valuations, the Court adopts, for the most part, as its findings, [Mr. Collins'] expert and rebuttal reports. . . . The Court finds that the greater weight and preponderance of the evidence and application of Tennessee valuation law supports [Mr. Collins'] determinations." At pages 16-19 of the order, the trial court explained the "one modification" it was making to asset value, and it explained why it was rejecting the use of net operating losses to increase asset value. Asset value, of course, is one of the three components of the Delaware Block method of valuation. As to earnings value (another component of the Delaware Block method), the trial court, on page 20, criticized Mr. d'Almeida's Report because it "does not actually apply the requirement of the Delaware Block Method that three to five years of earnings is the predictor of future earnings."

## CONCLUSION

In sum, we overrule *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659 (Tenn. 1983), to the extent that it implies that trial courts are allowed to use *only* the Delaware Block method to determine the fair value of the shares of a dissenting shareholder. We adopt the more open *Weinberger* approach, which allows "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Weinberger*, 457 A.2d at 712-13. This approach allows a trial court to consider valuation methods that incorporate projections of future value, so long as they are susceptible of proof as of the date of the merger and are not the product of speculation. The Delaware Block method of valuation remains available where appropriate, but trial courts may now choose to use another valuation method to determine the fair value of a dissenting shareholder's shares of stock.

Because we cannot determine on this record whether the trial court's evaluation of the evidence was affected by its perception that *Blasingame* mandated use of the Delaware Block valuation method, we vacate the trial court's order and remand for reconsideration the valuation of the dissenting shareholders' shares in light of our decision herein.

The decision of the Court of Appeals is reversed, the decision of the trial court is vacated, and the case is remanded for further proceedings consistent with this opinion. Costs on appeal are to be taxed to the Appellee Athlon Sports Communications, Inc., for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE

- 29 -