Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/09/2026 08:06 AM CST

Streck, Inc., plaintiff and third-party defendant,
appellee and cross-appellee, v. Carol Ryan et al.,
defendants, appellees and cross-appellants, and
The Ryan Foundation and Ramy Hanna, successor
trustee of Eileen Ryan Marital Trust 1,
third-party plaintiffs, appellants, and
Streck LLC et al., third-party
defendants, appellees
and cross-appellees.

___ N.W.3d ___

Filed January 9, 2026.    No. S-24-791.

1. **Jurisdiction.** A jurisdictional issue that does not involve a factual dispute presents a question of law.
2. **Final Orders: Appeal and Error.** A trial court's decision to certify a final judgment pursuant to Neb. Rev. Stat. § 25-1315(1) (Reissue 2016) is reviewed for an abuse of discretion.
3. **Summary Judgment: Appeal and Error.** An appellate court reviews a district court's grant of summary judgment de novo.
4. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.
5. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.
6. **Contracts.** The interpretation of a contract and whether a contract is ambiguous are questions of law.
7. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.
8. **Final Orders: Appeal and Error.** Neb. Rev. Stat. § 25-1315(1) (Reissue 2016) permits a trial court to certify an otherwise interlocutory order as

a final, appealable judgment under the limited circumstances set forth in the statute.

9. **Courts: Judgments.** A trial court considering certification of a final judgment should weigh factors such as (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the trial court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in setoff against the judgment sought to be made final; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

10. **Declaratory Judgments.** A declaratory judgment action is the proper judicial proceeding to determine a party's rights and obligations under a particular statute.

11. **Contracts: Corporations: Shareholder Agreements.** A corporation's articles of incorporation and the laws of the state of incorporation form a charter, which constitutes a contract between the corporation and the individuals who become shareholders or members of the corporation.

12. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

13. **Statutes: Legislature: Intent.** In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

14. **Statutes.** It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

15. **Courts: Statutes: Intent.** Courts properly look to the official comments contained in a model act on which a Nebraska statute or series of statutes was patterned for some guidance in an effort to ascertain the intent of the legislation.

16. **Corporations: Contracts.** Standard rules of contract interpretation apply to articles of incorporation.

17. **Contracts: Words and Phrases.** A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.

18. **Contracts.** A court is not free to rewrite a contract or to speculate as to the terms of the contract which the parties have not seen fit to include.

19. **Corporations: Statutes.** The appraisal remedy in case of shareholder dissent is entirely the product of statute. As such, it may be exercised only within the time and subject to the conditions prescribed in the statute.

20. **Contracts.** Whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses.

Appeal from the District Court for Sarpy County: NATHAN B. COX, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellants.

Victoria H. Buter, of Kutak Rock, L.L.P., and Donna M. Welch, Mark Filip, Gabor Balassa, and Timothy Knapp, pro hac vice, for appellees and cross-appellees.

John A. Svoboda, Ryan M. Kunhart, and Claire E. Monroe, of Dvorak Law Group, L.L.C., for appellees and cross-appellants.

CASSEL, STACY, PAPIK, FREUDENBERG, and BERGEVIN, JJ., and ALIOTH, District Judge.

CASSEL, J.

## I. INTRODUCTION

After a corporation sold its assets, some holders of Class A voting and Class B nonvoting stock asserted appraisal rights. Upon cross-motions for partial summary judgment, the district court relied on an appraisal statute[1] and determined that nonvoting shareholders lacked appraisal rights for the transaction. On appeal from a certified judgment,[2] Class B shareholders attack that determination. Although they make complicated arguments based on numerous statutory

---

[1] Neb. Rev. Stat. § 21-2,172 (Reissue 2022).

[2] See Neb. Rev. Stat. § 25-1315(1) (Reissue 2016).

provisions, the statute limiting the appraisal right for a "disposition of assets" to a shareholder "entitled to vote on the disposition" controls.[3] We affirm.

## II. BACKGROUND

### 1. Streck, Inc.

In 2022, Streck, Inc., was a privately held Nebraska S corporation. Thus, it was not publicly traded. Its shares were owned almost entirely by the family of Wayne Ryan and Eileen Ryan. Constance M. Ryan was Streck's president and chief executive officer. She was also the "controlling voting shareholder" of Streck.

Streck's articles of incorporation, amended in November 2014, authorized it to issue two classes of common stock: It could issue up to 600,000 shares of Class A voting shares and up to 50,180,000 shares of Class B nonvoting shares. The articles specified, "Except for the right to vote, all of the rights and preferences of the Class A voting shares and the Class B non-voting shares shall be identical."

The underlying action involves both Class A and Class B shareholders. However, the appeal affects the rights of the Class B shareholders only. The parties who will be referred to as the "Ryan Defendants" are owners or beneficial owners of Streck's Class B common stock. They are Carol Ryan, Steven Ryan, and Timothy Ryan, in their individual and representative capacities. Carol and Steven each owned 10,000 shares of Class A stock and were beneficial owners of 887,304 shares of Class B stock.

The largest holder of Streck's Class B stock was the Ryan Foundation, a charitable foundation organized under Nebraska law. Ramy Hanna is a successor trustee of the Eileen Ryan Marital Trust 1 for the benefit of the Ryan Foundation. Collectively, the Ryan Foundation and Hanna will be referred to

---

[3] § 21-2,172(a)(3).

as "the Foundation." Sometime after February 1, 2023, shares held in the Eileen Ryan Marital Trust 1 for the Foundation's benefit were transferred to it. Afterward, the Foundation owned 9,288,054 shares of Class B stock.

### 2. PROPOSALS TO PURCHASE

In September 2022, Larry Gies, the founder and chief executive officer of Madison Industries (Madison), sent Constance a letter of intent proposing to purchase Streck for $1.3 billion. A special committee for Streck was formed to evaluate the proposal. Gies subsequently raised the offer price to $1.6 billion. Streck signed the letter of intent.

Streck then sent a letter to its shareholders and beneficiaries concerning the pending sale. The letter stated that the transaction would be structured as "an F reorganization [which] involves creating a new holding company for Streck, merging Streck into a new Delaware limited liability company ('Streck LLC') subsidiary of the holding company and selling the equity interests in Streck LLC to a newly formed subsidiary of Madison." The letter further stated that the transaction would require the approval of holders of a majority of both the Class A and the Class B common stock. Subsequently, a proxy statement presented to Streck's shareholders estimated the proceeds payable upon closing of the transaction to be $70.08 per share.

In December 2022, a potential competitor emerged. The president and chief executive officer of a publicly traded company sent Constance a nonbinding letter of intent, formalizing that company's interest in Streck. It sought to acquire Streck for $2 billion. Constance did not pursue this proposition. According to Constance's deposition testimony, the proposal arrived while she "was under a noncompete, and not to talk to anyone else, with [Gies]." She also did not inform any Class B shareholder, aside from possibly her son, about this proposal.

An entity hired to provide a fairness opinion of the proposed sale submitted a letter to Streck's board of directors, stating that the base price was fair from a financial point of view. The Nebraska Attorney General, who has oversight responsibility for the Foundation, reviewed the fairness opinion and expressed that "the sale of Streck . . . to Madison . . . is in the best interest of the . . . Foundation."

### 3. Transaction

In January 2023, Gies purchased 196,850 shares of Streck's Class A stock from Constance. This made Gies the controlling shareholder of Streck. Gies also agreed to purchase a majority of the Class B nonvoting common stock of Streck held by Constance and her children at the same price of $70.08 per share.

The transaction with Madison was restructured as a disposition of assets. Streck would first transfer substantially all of its assets and liabilities to "Streck LLC." Then, Streck would sell the equity of Streck LLC to a subsidiary of Madison Technologies Holdings LLC. Lastly, Streck would distribute the proceeds it received and other cash to its shareholders. Streck's board of directors unanimously voted to approve the transaction, concluding that it was in the best interests of its shareholders.

The day before the scheduled shareholders' meeting, Carol and Steven notified Streck that they intended to assert appraisal rights with respect to the transaction as to their Class A voting common stock of Streck. Certain owners and indirect beneficiaries of Class B nonvoting common stock similarly informed Streck that they intended to assert appraisal rights.

During Streck's special shareholders' meeting, Gies and Constance voted their Class A shares (196,850 and 122,150 shares, respectively) in favor of the transaction, while Carol and Steven each voted their 10,000 Class A shares against it. The holder of the other 10,000 shares of voting stock abstained from voting.

The transaction officially closed on February 21, 2023. Between that date and December 8, Streck transferred the closing cash proceeds to all shareholders of Class B nonvoting common stock. The Class B shareholders each received $70.10 per share. The parties do not focus on the 2-cent difference from the price quoted to Constance and her children.

Two days later, a "Notice of Appraisal Rights" addressed to shareholders of Streck stated in part that the transfer of equity interests of Streck LLC to Madison pursuant to a securities purchase agreement "represents a disposition of assets" under Neb. Rev. Stat. § 21-2,170 (Reissue 2022) of the Nebraska Model Business Corporation Act (NMBCA).[4] It further stated that owners of Class A voting common stock were entitled to appraisal rights under §§ 21-2,171 through 21-2,183. According to the notice, Streck estimated the fair value of the shares to be $70.10.

Subsequently, the Foundation and the Ryan Defendants notified Streck that they were seeking payment of $140.12 per share for their common stock.

### 4. COMPLAINT

Due to shareholders' claims that Streck sold its assets for less than fair value, Streck brought an appraisal action under § 21-2,181. The numerous defendants fell into two categories: Those claiming to own Class A voting shares of Streck (i.e., Carol, individually, and Steven, individually) and those claiming to own or beneficially own Class B nonvoting shares (i.e., the Foundation and the Ryan Defendants). With respect to the Class A shareholders, Streck asked the court to confirm that the proceeds received represented fair value.

As to the Class B shareholder defendants (i.e., the Foundation and the Ryan Defendants), Streck requested a declaratory judgment that they lacked appraisal rights under the NMBCA and a declaration that their attempt to assert such

---

[4] Neb. Rev. Stat. §§ 21-201 to 21-2,232 (Reissue 2022).

rights was null and void. Alternatively, if the court found that some or all of those Class B shareholders were entitled to assert appraisal rights, Streck sought a determination of the fair value of the shares.

### 5. Counterclaims and Third-Party Complaints

The Foundation filed a counterclaim and a third-party complaint against Streck, Constance, Gies, Madison, Streck LLC, and "Doe II LLC, and Doe Corp." for appraisal and payment of fair value for stock. The Ryan Defendants filed a separate counterclaim and third-party complaint for the same relief. Both filings asserted that "Streck . . . and Streck, LLC are generally referred to and regarded as parties with common roles as Streck, LLC is [Streck's] successor and represents a continuum of its assets, enterprises, business, and obligations."

### 6. Motions for Partial Summary Judgment

Collectively, the parties filed three motions for partial summary judgment. Each sought a determination of whether the Class B shareholders were entitled to appraisal rights. The Foundation's motion additionally asserted that declaratory judgment was an unavailable remedy. The motion of Streck, Constance, Gies, Madison, and Streck LLC further requested summary judgment for "[Constance], . . . Gies, and Madison . . . on all appraisal claims against them, whether by Class A or Class B shareholders."

### 7. District Court's Determination

Following a hearing, the district court granted the motion for partial summary judgment of Streck, Constance, Gies, Madison, and Streck LLC and denied the motions of the Foundation and the Ryan Defendants. The court reasoned that § 21-2,172(a)(3) limited appraisal rights to shareholders who are entitled to vote on the disposition of assets. It determined

as a matter of law that Class B shareholders do not enjoy appraisal rights in this action. The court found that it did not have personal jurisdiction over Constance, Gies, Madison, "Doe I LLC, Doe II LLC and Doe Corp." It ordered that "[Constance], . . . Gies and Madison . . . are hereby dismissed from this litigation."

### 8. MOTION TO ALTER OR AMEND OR TO CERTIFY

The Ryan Defendants filed a motion to alter or amend the order or to certify a judgment.[5] The Foundation filed a similar motion. Streck, Gies, Constance, and Madison opposed the motions, arguing that certification of the interlocutory appeal was not appropriate. The court entered an order certifying the case for immediate appeal and staying the proceedings regarding Class A shareholders pending the appeal.

The Foundation appealed, and the Ryan Defendants filed a cross-appeal. We granted the petitions to bypass[6] filed by the Foundation and the Ryan Defendants, which petitions Streck, Constance, Gies, Madison, and Streck LLC joined.

## III. ASSIGNMENTS OF ERROR

The Foundation and the Ryan Defendants each assign six largely overlapping errors. They primarily challenge the district court's determination that Class B shareholders do not have appraisal rights. Additional challenges are made regarding the availability of declaratory judgment as a remedy and the dismissal of certain third-party defendants.

## IV. STANDARD OF REVIEW

[1] A jurisdictional issue that does not involve a factual dispute presents a question of law.[7]

---

[5] See § 25-1315.

[6] See Neb. Rev. Stat. § 24-1106(2) (Cum. Supp. 2024).

[7] *Johnson v. City of Omaha*, 319 Neb. 402, 23 N.W.3d 420 (2025).

[2] A trial court's decision to certify a final judgment pursuant to § 25-1315(1) is reviewed for an abuse of discretion.[8]

[3,4] An appellate court reviews a district court's grant of summary judgment de novo.[9] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[10]

[5] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[11]

[6] The interpretation of a contract and whether a contract is ambiguous are questions of law.[12]

## V. ANALYSIS

### 1. Jurisdiction

[7] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.[13] Here, the district court certified for immediate appeal an order granting partial summary judgment. No party has assigned error to that determination. But if the trial court abused its discretion in certifying an order as final under § 25-1315(1), there is no final order before the appellate court and, thus, no jurisdiction of the appeal.[14] Therefore, we must consider the propriety of the certification.

---

[8] *Castellar Partners v. AMP Limited*, 291 Neb. 163, 864 N.W.2d 391 (2015).

[9] *Noel v. Pathology Med. Servs., ante* p. 92, 26 N.W.3d 196 (2025).

[10] *Id.*

[11] *Johnson v. City of Omaha, supra* note 7.

[12] *D&M Roofing & Siding v. Distribution, Inc.*, 319 Neb. 707, 24 N.W.3d 850 (2025).

[13] *Czech v. Allen*, 318 Neb. 904, 21 N.W.3d 1 (2025).

[14] See *Castellar Partners v. AMP Limited, supra* note 8.

### (a) § 25-1315(1)

[8] Section 25-1315(1) permits a trial court to certify an otherwise interlocutory order as a final, appealable judgment under the limited circumstances set forth in the statute.[15] One may bring an appeal under § 25-1315(1) only when (1) multiple causes of action or multiple parties are present, (2) the court enters a "final order[]" within the meaning of Neb. Rev. Stat. § 25-1902 (Cum. Supp. 2024) as to one or more but fewer than all of the causes of action or parties, and (3) the trial court expressly directs the entry of such final order and expressly determines that there is no just reason for delay of an immediate appeal.[16] Here, these requirements are met.

### (b) Certification Factors

Satisfying the statutory requirements does not necessarily mean that certification is proper. Certification of a final judgment must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties.[17]

[9] A trial court considering certification of a final judgment should weigh factors such as (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the trial court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in setoff against the judgment sought to be made final; and (5) miscellaneous factors such as delay, economic and solvency considerations, shortening

---

[15] *Id.*

[16] See *Cerny v. Todco Barricade Co.*, 273 Neb. 800, 733 N.W.2d 877 (2007).

[17] *Id.*

the time of trial, frivolity of competing claims, expense, and the like.[18]

### (c) Certification Not Abuse of Discretion

In contemplating whether to certify the appeal as final, the district court considered the relevant factors and laid out the potential results of granting or refusing the request. It found that certifying the issue as to the appraisal rights of Class B shareholders would result in a single trial on the matter of stock valuation. This, in turn, would prevent disparate outcomes.

We cannot say that the district court's reasons for certifying the partial summary judgment as final are clearly untenable. Because the court did not abuse its discretion in certifying a final judgment under § 25-1315(1), we have jurisdiction over the appeal.

### 2. AVAILABILITY OF DECLARATORY JUDGMENT

Before turning to the heart of this appeal, we must address another preliminary matter. The Foundation contends that Streck's suit for declaratory judgment was improper. The Foundation makes several arguments, but none is persuasive.

### (a) Origination of Proceeding

To start, we recall the lawsuit's origin. After the Foundation and the Ryan Defendants made a demand for payment under § 21-2,180, Streck commenced a proceeding under § 21-2,181.

Section 21-2,181(a) provides that after a shareholder makes demand for payment under § 21-2,180 which remains unsettled, the corporation has 60 days to petition the court to determine the fair value of the shares and accrued interest. If the corporation fails to commence such a proceeding within 60

---

[18] *Id.*

days, it must pay each shareholder the amount demanded, plus interest.[19] Thus, Streck asked the court to confirm that the proceeds received by the shareholders represented fair value.

But because Streck believed that only Class A shareholders had appraisal rights, its complaint also sought "a declaratory judgment that the Class B Defendants do not have such rights with respect to the Transaction."

(b) Foundation's Arguments

The Foundation cites two propositions of law to support its contention that declaratory judgment was an unavailable remedy. One is that declaratory judgment is not available when there is a serviceable statutory or other available remedy.[20] The other is that declaratory judgments are available when a present actual controversy exists, all interested persons are parties to the proceedings, and a justiciable issue exists for resolution.[21]

Based on these propositions, the Foundation makes several arguments. It claims that Streck needed to "sue the Class Bs within the mandatory statutory framework under . . . §[]21-2,171 et seq."[22] The Foundation further contends that declaratory judgment was unavailable because Streck sought to resolve an anticipated case before an actual case or controversy existed. It additionally argues that Streck failed to meet the requirements for declaratory judgment. According to the Foundation, fewer than all issues were framed because the complaint did not mention Nebraska's charity protection statutes and fewer than all parties were present because the complaint failed to name the Nebraska Attorney General.

---

[19] § 21-2,181(a).

[20] See *Chase County v. City of Imperial*, 302 Neb. 395, 923 N.W.2d 428 (2019).

[21] See *id.*

[22] Brief for appellants at 19.

(c) Declaratory Judgment Proper

[10] The proceeding under § 21-2,181 was clearly proper as to the Class A shareholders; however, whether Class B shareholders could or should be included is less clear. A declaratory judgment action is the proper judicial proceeding to determine a party's rights and obligations under a particular statute.[23]

Here, because Class B shareholders made a demand for payment under § 21-2,180, Streck feared that it needed to commence an appraisal proceeding within 60 days or be forced to pay the shareholders the amount demanded.[24] And because the Class B shareholders were asserting appraisal rights under § 21-2,172—rights that Streck did not believe those shareholders possessed—Streck asked for confirmation from the court that Class B shareholders did not possess appraisal rights.

This situation exceeded the bounds of a mere appraisal proceeding. Streck appropriately commenced a statutory appraisal proceeding under § 21-2,181. However, § 21-2,181 was a partial remedy only. It was not a serviceable remedy as to the Class B shareholders. Because of the peculiar fact situation, declaratory judgment was necessary to implement the statutory procedure. We observe that in a case from Indiana, when a shareholder of both voting common stock and nonvoting preferred stock asserted dissenters' rights and demanded payment for both classes of stock, the cooperative association—which was governed both by the Indiana Agricultural Cooperative Act and the Indiana Business Corporation Law—filed a declaratory judgment action.[25] The cooperative asserted that the shareholder had no dissenters' rights, but that it if did have such rights, it was entitled to exercise them only with

---

[23] *Ameritas Life Ins. v. Balka*, 257 Neb. 878, 601 N.W.2d 508 (1999).

[24] See § 21-2,181(a).

[25] *Indiana Farm Bureau Co-op. v. AgMax*, 622 N.E.2d 206 (Ind. App. 1993).

regard to the share of common stock.[26] In that case, there was no assertion that declaratory judgment was unsuitable. We see nothing improper about seeking a declaratory judgment concerning whether certain parties who asserted appraisal rights indeed possessed such rights under § 21-2,172.

The Foundation's arguments based upon its status as a charitable foundation lack merit. Because Streck commenced the proceeding under § 21-2,181, charity protection statutes were not implicated. Moreover, the Nebraska Attorney General— who was not a shareholder—would not be a proper party because only those shareholders "whose demands remain unsettled" had to be made a party to the proceeding.[27]

### 3. Appraisal Rights

We now turn to the heart of this appeal: whether the Class B shareholders have appraisal rights with respect to the transaction consummated. To resolve the issue, we start by discussing the NMBCA and its predecessor, along with the nature of the NMBCA. Then, we set forth principles of interpretation relevant to the NMBCA and articles of incorporation. Next, we provide a brief history of appraisal rights. After that, we summarize Streck's position. Finally, we address— and reject—the arguments raised by the Foundation and the Ryan Defendants.

### (a) Nature of Corporate Governance

Initially, corporation chartering laws were often overly restrictive and regulatory.[28] This led to efforts to draft legislation that would simplify business transactions, eliminate unreasonable risks to shareholders and directors, and protect

---

[26] See *id.*

[27] § 21-2,181(c).

[28] See 1 James D. Cox & Thomas Lee Hazen, The Law of Corporations § 2:5 (3d ed. 2010).

shareholders and persons dealing with the corporation.[29] The first Model Act, completed in 1950, was viewed as enabling or permissive.[30] That act underwent a complete revision as the Model Business Corporation Act of 1984.[31] Many state legislatures have adopted some version of the model act.

[11] A corporation's articles of incorporation and the laws of the state of incorporation form a charter, which constitutes a contract between the corporation and the individuals who become shareholders or members of the corporation.[32] Most corporate statutes allow a corporation's articles of incorporation or bylaws to vary statutory provisions.[33] The enabling statutes thus provide standards for corporate governance unless the articles of incorporation or bylaws provide otherwise.[34]

The Model Business Corporation Act sets forth mandatory requirements for all articles of incorporation and also optional provisions.[35] Mandatory requirements include a corporate name and the number of shares the corporation is authorized to issue.[36] Discretionary items include provisions not inconsistent with law relevant to authority of the corporation, its board of directors, and shareholders.[37]

### (b) NMBCA and Its Predecessor

As alluded to earlier, Nebraska has adopted the NMBCA, which is an enabling act. The NMBCA's predecessor was

---

[29] See *id.*

[30] See *id.*

[31] See *id.*

[32] See *id.*, § 3:11.

[33] See *id.*, § 3:10.

[34] See *id.*

[35] See 1 Model Business Corporation Act Ann. § 2.02 (3d ed. 2002).

[36] See *id.*, § 2.02(a).

[37] See *id.*, § 2.02(b).

called the Business Corporation Act (BCA).[38] The BCA was established in 1995, when the Nebraska Legislature passed legislation to codify the 1984 version of the Model Business Corporation Act.[39] A statute within the BCA provided that "[t]he Legislature shall have the power to amend or repeal all or part of the [BCA] at any time and all domestic and foreign corporations subject to the act shall be governed by the amendment or repeal."[40]

In 2014, the Legislature enacted a law[41]—operative January 1, 2016[42]—to repeal the BCA and replace it with the NMBCA.[43] Like the BCA, the NMBCA was based on the Model Business Corporation Act.[44] And the NMBCA similarly contained a statute whereby the Legislature reserved the power to amend the NMBCA at any time and to have the amendment govern all corporations subject to the act.[45] The Legislature thereafter amended various parts of the NMBCA in 2015,[46] 2016,[47] 2017,[48] and 2020.[49]

---

[38] Neb. Rev. Stat. § 21-2001 (Reissue 1997).

[39] See Introducer's Statement of Intent, L.B. 109, Banking, Commerce and Insurance Committee, 94th Leg., 1st Sess. (Jan. 23, 1995). See, also, *State ex rel. Columbus Metal v. Aaron Ferer & Sons*, 272 Neb. 758, 725 N.W.2d 158 (2006).

[40] Neb. Rev. Stat. § 21-2002 (Reissue 1997). See, also, Neb. Rev. Stat. § 21-20,133 (Reissue 1991) (reserving similar power since 1963).

[41] See 2014 Neb. Laws, L.B. 749.

[42] *Id.*, § 295.

[43] See Introducer's Statement of Intent, L.B. 749, Banking, Commerce and Insurance Committee, 103d Leg., 2nd Sess. (Feb. 3, 2014).

[44] See *id.*

[45] § 21-202.

[46] See 2015 Neb. Laws, L.B. 157, L.B. 279, and L.B. 294.

[47] See 2016 Neb. Laws, L.B. 794.

[48] See 2017 Neb. Laws, L.B. 35 and L.B. 99.

[49] See 2020 Neb. Laws, L.B. 808.

Although Streck was incorporated in the 1970s and revised its articles of incorporation in 2014, no party has challenged application of the current NMBCA statutes in this appeal. Based on § 21-202, and antecedent statutes stating similar reservations, we agree that the current statutes control.

### (c) Principles of Interpretation

Resolving the critical question on appeal involves interpretation and application of the NMBCA and the articles of incorporation. We set forth interpretative rules.

### *(i) NMBCA*

[12-14] Familiar principles of statutory interpretation apply to the NMBCA. Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[50] In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[51] It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.[52]

[15] Because the NMBCA enactment is patterned after the Model Business Corporation Act, we consider the model legislation. Courts properly look to the official comments contained in a model act on which a Nebraska statute or series of statutes was patterned for some guidance in an effort to ascertain the intent of the legislation.[53]

---

[50] *Wayne L. Ryan Revocable Trust v. Ryan*, 308 Neb. 851, 957 N.W.2d 481 (2021).

[51] *Anderson v. A & R Ag Spraying & Trucking*, 306 Neb. 484, 946 N.W.2d 435 (2020).

[52] *Syring v. Archdiocese of Omaha*, 317 Neb. 195, 9 N.W.3d 445 (2024).

[53] *Groseth v. Groseth*, 257 Neb. 525, 600 N.W.2d 159 (1999).

### (ii) Articles of Incorporation

[16-18] Standard rules of contract interpretation apply to articles of incorporation.[54] A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.[55] A court is not free to rewrite a contract or to speculate as to the terms of the contract which the parties have not seen fit to include.[56]

Before applying these interpretative principles, we provide a background concerning appraisal rights.

### (d) History of Appraisal Rights

#### (i) Broad Overview

At common law, a corporation could not effect major corporate changes without the unanimous consent of its stockholders.[57] This requirement protected minority shareholders by providing veto power,[58] but it also meant that the owner of a single share could block, for example, the merger of an entire corporation.[59]

Over time, corporations began adding provisions to their charters to authorize fundamental corporate changes by majority consent.[60]

---

[54] 7A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 3640 (perm. ed., rev. vol. 2023).

[55] *D&M Roofing & Siding v. Distribution, Inc., supra* note 12.

[56] *Id.*

[57] See *Stoneman v. United Neb. Bank*, 254 Neb. 477, 577 N.W.2d 271 (1998). See, also, 12B William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 5906.10 (perm. ed., rev. vol. 2017).

[58] See *Athlon Sports Communications v. Duggan*, 549 S.W.3d 107 (Tenn. 2018).

[59] See *Stoneman v. United Neb. Bank, supra* note 57.

[60] See Mary Siegel, *Back to the Future: Appraisal Rights in the Twenty-First Century*, 32 Harv. J. on Legis. 79 (1995).

But this left shareholders in the minority vulnerable to abuse by majority shareholders, especially in closely held corporations.[61] Consequently, statutes were enacted to provide shareholders who are dissatisfied with certain corporate transactions with a right to receive the cash value of their stock and to have an appraisal when an agreement regarding value cannot be reached.[62]

[19] The statutory basis underlies an important principle having two components. "The appraisal remedy is entirely the product of statute."[63] As such, it "may be exercised only within the time and subject to the conditions prescribed in the statute."[64]

### (ii) Nebraska's Model Acts

Nebraska's BCA referred to appraisal rights as "[d]issenter's rights."[65] With respect to a corporation's merger, plan of share exchange, or sale or exchange of corporate property, a shareholder would be entitled to dissent and obtain payment of the fair value only if the shareholder was entitled to vote on the particular corporate action.[66] The BCA allowed the articles of incorporation to confer a right to dissent, providing such a right for "[a]ny corporate action taken pursuant to a shareholder vote to the extent the articles of incorporation, the bylaws, or a resolution of the board of directors provides that voting or nonvoting shareholders are entitled to dissent and obtain payment for their shares."[67]

---

[61] See *Athlon Sports Communications v. Duggan, supra* note 58.

[62] 12B Fletcher, *supra* note 57, § 5906.10.

[63] *Id.* at 423.

[64] *Id.*, § 5906.70 at 452.

[65] See Neb. Rev. Stat. § 21-20,137 (Reissue 1997). Accord Neb. Rev. Stat. §§ 21-20,138 to 21-20,150 (Reissue 1997).

[66] See § 21-20,138(1)(a) through (c).

[67] § 21-20,138(e).

When the Legislature replaced the BCA with the NMBCA, it made several changes concerning a minority shareholder's rights. To start, the NMBCA changed the terminology from "dissenter's rights" to "appraisal rights."[68] Next, with respect to a merger and a share exchange, it eliminated the requirement that a shareholder be entitled to vote on the action in order to have appraisal rights.[69] Regarding the articles of incorporation, the NMBCA provided appraisal rights for "[a]ny other amendment to the articles of incorporation, merger, share exchange, or disposition of assets to the extent provided by the articles of incorporation, bylaws, or a resolution of the board of directors."[70] However, with respect to a sale of assets, the NMBCA, like the BCA, required that a shareholder be entitled to vote on the disposition in order to have appraisal rights.[71]

With this history in place, we turn to the parties' respective arguments.

(e) Streck's Position

Streck makes a simple textual argument based on § 21-2,172(a)(3). It relies on the portion of the statute providing that "[a] shareholder is entitled to appraisal rights . . . in the event of any . . . [c]onsummation of a disposition of assets . . . if the shareholder is entitled to vote on the disposition . . . ."[72] Using the plain statutory language, Streck asserts that "[i]n a disposition of assets, a 'shareholder is entitled to appraisal rights' only 'if the shareholder is entitled to vote on the disposition.'"[73] Streck submits that because Streck's articles of incorporation designated Class B stock as nonvoting, the

---

[68] See § 21-2,172(a).

[69] See § 21-2,172(a)(1) and (2).

[70] § 21-2,172(a)(5).

[71] See §§ 21-20,138(1)(c) and 21-2,172(a)(3).

[72] § 21-2,172(a)(3).

[73] Brief for appellees at 8 (emphasis omitted).

Class B shareholders do not have appraisal rights for Streck's disposition of assets.

### (f) Foundation's and Ryan
### Defendants' Arguments

The Foundation and the Ryan Defendants make numerous arguments to support their position that the Class B shareholders are entitled to appraisal rights. After analyzing the various arguments, we find them unpersuasive.

### (i) Step Transaction Doctrine Does Not
### Apply to Asset Sale Under § 21-2,172

The Foundation argues that Streck, Constance, Gies, Madison, and Streck LLC added an artificial step to the transaction to defeat the Class B shareholders' voting and appraisal rights. The Foundation does not point to any provision of the NMBCA to support its argument. Instead, it relies on tax cases applying a "step transaction doctrine," which has been used "in assessing the tax consequences of multifaceted business transactions."[74]

We have explained that "[t]he step transaction doctrine arose from the 'central tenet of tax law that tax liability depends upon the substance not the form of a transaction.'"[75] The Foundation has not directed our attention to a case applying this doctrine outside the tax context, and we decline to apply it to a corporate transaction under § 21-2,172 in the absence of any statutory basis.

### (ii) Shareholder's Status as Charitable
### Foundation Does Not Alone
### Entitle It to Appraisal Rights

The Foundation alleges that the court erred in failing to recognize that Neb. Rev. Stat. §§ 21-1916 (Reissue 2022) and

---

[74] *Mid City Bank v. Douglas Cty. Bd. of Equal.*, 260 Neb. 282, 288, 616 N.W.2d 341, 346 (2000).

[75] *Id.* at 289, 616 N.W.2d at 346.

30-3215 (Reissue 2016) mandate that Class B shareholders have appraisal rights where a charitable foundation holds nonvoting shares. It also contends that these statutes forbid self-dealing transactions.

The Foundation's arguments premised upon statutes governing charitable foundations are unavailing. Neither § 21-1916 nor § 30-3215 mentions appraisal rights. Nor does either statute refer to § 21-2,172. Likewise, § 21-2,172 makes no mention of charitable foundations. We see nothing in these statutes that would confer appraisal rights on a charitable foundation merely because of its charitable status. Because the Foundation is not entitled to vote on the disposition of assets, it does not have appraisal rights under § 21-2,172.

### (iii) Earlier Proposed Transaction
### Not Pertinent

The Foundation highlights that the prior contemplated transaction was a sale of shares and contends that Constance and Gies merely "added a layer" to "claim[] the Transaction was now an 'asset sale.'"[76] The Foundation calls it "a paper only sale of assets"[77] that "was designed to create the appearance of a disposition of assets and not a sale of stock."[78] Meanwhile, the Ryan Defendants refer to it as a "form over substance conversion from a merger to a disposition of assets."[79] But even these characterizations recognize that the completed transaction was a sale of assets.

Although the Foundation and the Ryan Defendants place some significance on an earlier proposed transaction, that unconsummated transaction does not change the nature of the completed transaction at issue. The transaction consummated was a disposition of assets.

---

[76] Brief for appellants at 28.

[77] Id. at 13.

[78] Id. at 26.

[79] Brief for cross-appellants at 10.

Under § 21-2,172(a), "[a] shareholder is entitled to appraisal rights" for a disposition of assets "(3) . . . if the shareholder is entitled to vote on the disposition." Under Streck's articles of incorporation, only Class A shareholders held the right to vote. Thus, only Class A shareholders have appraisal rights in connection with a disposition of assets.

### (iv) Exceptions for Interested
### Transactions Do Not Apply

The Foundation and the Ryan Defendants focus on the transaction's being an "[i]nterested transaction."[80] At oral arguments, counsel for Streck conceded that the transaction qualified as an interested transaction. However, the arguments that Class B shareholders have appraisal rights because it was an interested transaction are flawed.

First, the Foundation and the Ryan Defendants focus on the portion of § 21-2,172(b)(4) stating that appraisal rights are available "where the corporate action is an interested transaction." In doing so, they ignore the beginning of the subsection. Section 21-2,172(b)(4) starts with the directive that "[s]ubdivision (b)(1) . . . shall not be applicable." Turning to § 21-2,172(b)(1), its purpose is to strip appraisal rights for shares that are publicly traded. The effect of § 21-2,172(b)(4), then, is to reinstate appraisal rights to shareholders who lost them under § 21-2,172(b)(1). But because Streck's shares are not publicly traded, § 21-2,172(b)(1) and (4) have no application to Streck's shareholders.

Second, the Foundation and the Ryan Defendants misread language in § 21-2,172(a)(3) as giving all shareholders appraisal rights if the disposition of assets is an interested transaction. The statutory language provides that "appraisal rights shall not be available to any shareholder of the corporation . . . if (i) under the terms of the corporate action approved by the shareholders there is to be distributed to shareholders in cash its net

---

[80] See § 21-2,171(5).

assets" and if "(ii) the disposition of assets is not an interested transaction."[81] Rather than conferring appraisal rights, the statutory text *takes away* appraisal rights for all shareholders when a corporation is liquidated and when the disposition of assets is *not* an interested transaction. The reasoning behind this exception was explained decades ago: "These transactions are unlikely to be unfair to minority shareholders since majority and minority are being treated in precisely the same way and all shareholders will ultimately receive cash for their shares."[82] We conclude that § 21-2,172(a)(3) does not give the Class B shareholders appraisal rights for this interested transaction.

### (v) Articles Must Be
### Properly Interpreted

To resolve the argument that Streck's articles of incorporation provide Class B shareholders with appraisal rights, we must consider the articles together with the NMBCA and apply the principles of interpretation set forth earlier. The articles' provisions concerning the shares authorized are key.

According to a leading treatise, great care must be exercised in drafting language regulating shareholder rights and its interpretation requires close reading. "Fundamental to drafting the capital section of the articles of incorporation is the principle that all shares of stock authorized have identical rights, privileges, and preferences unless the articles expressly provide otherwise."[83] Thus, "if not otherwise provided, all shares enjoy equal rights to participate ratably in dividends when declared by the board of directors, in the net assets of the firm on liquidation, and in voting."[84] The treatise cautions that "great care" must be taken "when drafting the relative rights,

---

[81] § 21-2,172(a)(3).

[82] 3 Model Business Corporation Act Ann. § 13.02, official comment at 1365 (3d ed. 1984 & Supp. 1993).

[83] 1 Cox & Hazen, *supra* note 28, § 3:9 at 202.

[84] *Id.*

privileges, and preferences that are to exist among classes of stock" because "questions that turn on [stockholders'] relative rights, privileges, and preferences are approached by the courts as matters of contract."[85] As such, "[t]he litigants' conflicting contentions are resolved by a close reading of the rights memorialized in the articles of incorporation."[86]

### a. Mandatory Provisions

The NMBCA requires that articles of incorporation specify certain matters concerning authorized shares.[87] If the articles authorize more than one class or series of shares, "the articles of incorporation must prescribe a distinguishing designation for each class or series and must describe, prior to the issuance of shares of a class or series, the terms, including the preferences, rights, and limitations, of that class or series."[88] In Streck's articles, voting rights are what differentiate Class A shares from Class B shares. The NMBCA also mandates that the articles of incorporation authorize at least one class of shares that together have unlimited voting rights.[89] Here, it is Class A shares that have unlimited voting rights.

### b. Optional Provisions

The NMBCA also addresses optional provisions in articles of incorporation. One statute provides that the articles may authorize one or more classes of shares that "[h]ave special, conditional, or limited voting rights, or no right to vote, except to the extent otherwise provided by the [NMBCA]."[90] A different statute provides that "[t]he articles

---

[85] *Id.* at 205.

[86] *Id.*

[87] See §§ 21-220 and 21-237.

[88] § 21-237(a).

[89] § 21-237(b)(1).

[90] § 21-237(c)(1).

of incorporation may set forth . . . (2) [p]rovisions not inconsistent with law regarding . . . (iii) [d]efining, limiting, and regulating the powers of the corporation, its board of directors, and shareholders."[91]

### c. Specificity Required

We turn now to the arguments based on the articles of incorporation. Because the articles do not mention appraisal rights, the Foundation and the Ryan Defendants emphasize the portion of the sentence stating that Class A and Class B shares have "rights and preferences" that are "identical." However, they omit the introductory clause: "Except for the right to vote."

The introductory clause is particularly important here. We recall that it is the right to vote that distinguishes Streck's Class A shareholders from its Class B shareholders. And under § 21-2,172(a)(3), only those shareholders having a right to vote on a disposition of assets have appraisal rights for the transaction. Further, the articles' plain language—"Except for the right to vote"—is not limited to, say, voting on directors or voting to approve minutes. Because the articles do not give Class B shareholders voting rights and § 21-2,172(a)(3) does not confer appraisal rights on nonvoting shareholders, absent explicit authorization in the articles, it would be inconsistent with the law to give Class B shareholders appraisal rights in connection with a disposition of assets.

To skirt the inconsistency with § 21-2,172(a)(3), the Foundation and the Ryan Defendants turn to § 21-2,172(a)(5). That subsection entitles a shareholder to appraisal rights for a disposition of assets "to the extent provided by the articles of incorporation."[92] But the articles do not expressly mention, or "provide" for, a disposition of assets or appraisal rights. To read a provision that "all of the rights and preferences" of

[91] § 21-220(b).

[92] § 21-2,172(a)(5).

Class A and Class B shares are "identical" (except for the right to vote) as authorizing action that is statutorily available only to a shareholder having the right to vote goes too far.

Relying on the Indiana Business Corporation Law, which was modeled after the 1984 version of the Revised Model Business Corporation Act,[93] an Indiana appellate court reached a similar conclusion.[94] In that case, an Indiana Business Corporation Law statute provided that a shareholder was entitled to dissent from consummation of a plan of merger if shareholder approval was required for the merger and the shareholder was entitled to vote on the merger.[95] A shareholder of both voting common stock and nonvoting preferred stock asserted dissenters' rights with respect to both classes of stock. However, the cooperative association contended that the shareholder lacked dissenters' rights with respect to its nonvoting preferred stock.

The shareholder asserted that the articles of incorporation required shareholder approval for the merger. The assertion was based on provisions of the articles entitling holders of common stock to vote on any issue before the body.

The appellate court disagreed. It stated:

> Our reading of [the] Articles of Incorporation reveal[s] they do not require shareholder approval for mergers. Indeed, the Articles of Incorporation, which are quite comprehensive, consisting of ten separate articles and over twenty sections and subsections, do not mention merger at all. We decline to read into this document provisions which simply are not present. [The] Articles of Incorporation do not require shareholder approval for a merger.[96]

---

[93] See *In re ITT Derivative Litigation*, 932 N.E.2d 664 (Ind. 2010).

[94] See *Indiana Farm Bureau Co-op. v. AgMax, supra* note 25.

[95] See, *id.*; Ind. Code Ann. § 23-1-44-8(a)(1) (LexisNexis Cum. Supp. 2009).

[96] *Indiana Farm Bureau Co-op. v. AgMax, supra* note 25, 622 N.E.2d at 210.

The official comment to the Model Business Corporation Act addressing § 13.02(a), which is equivalent to the NMBCA's § 21-2,172(a), provides guidance. It teaches, "Obviously, an *express* grant of voluntary appraisal rights under section 13.02(a)(5) is intended to override any of the exceptions to the availability of appraisal rights in section 13.02(a)."[97] The 2016 revision confirmed that "[a]n express grant of voluntary appraisal rights under section 13.02(a)(5) overrides any of the exceptions to the availability of appraisal rights in section 13.02(a)."[98] To be "express" means to be "[c]learly and unmistakably communicated; stated with directness and clarity."[99] In the absence of an express grant of appraisal rights, we cannot read the articles of incorporation to authorize what is otherwise proscribed by the law.

### d. Foundation's and Ryan Defendants' Arguments Rely on Ambiguity

Because the articles of incorporation are silent on appraisal rights, the Ryan Defendants urge us to find ambiguity. They ask us to read "[e]xcept for the right to vote, all of the rights and preferences of the Class A voting shares and the Class B non-voting shares shall be identical" as giving all shareholders appraisal rights for a sale of assets under § 21-2,170. While all shareholders may enjoy appraisal rights with respect to certain corporate actions, the same is not true when the NMBCA bestows the right only upon shareholders entitled to vote on the action.

[20] The NMBCA sections inhere in Streck's articles. Statutes which are in effect at the time a contract is made are as much a part of the contract as if they were set forth

---

[97] 3 Model Business Corporation Act Ann. § 13.02, official comment at 13-22 (3d ed. 2002) (emphasis supplied).

[98] Model Business Corporation Act § 13.02, official comment at 13-12 (rev. 2016).

[99] Black's Law Dictionary 726 (11th ed. 2019).

therein.[100] The articles formed a contract between the corporation and the shareholders.[101] And whatever the construction of a particular clause of a contract, standing alone, may be, it must be read in connection with other clauses.[102] Thus, we do not fixate on the quoted sentence.

To be ambiguous, the articles must be susceptible of at least two reasonable but conflicting interpretations.[103] But here, where the only distinguishing designation between the shareholders is the right to vote, inferring that a nonvoting shareholder has a right that the NMBCA provides only to voting shareholders is not reasonable and would annul statutory language.

At the time the amended articles were adopted in 2014, the controlling statute limited appraisal rights only to shareholders having the right to vote. In other words, the statute was clear when the specific language was chosen for the amended articles. In addition, the NMBCA contemplated that a corporation's articles can "provid[e]" appraisal rights for a disposition of assets.[104] Had the drafters of the articles intended to do so, they would have chosen explicit language.

An express grant is necessary, and we cannot read its absence as creating ambiguity. Under § 21-2,172(a), "[a] shareholder is entitled to appraisal rights . . . in the event of any . . . (3) [c]onsummation of a disposition of assets pursuant to section 21-2,170 *if the shareholder is entitled to vote on the disposition* . . . ." In the absence of an express grant of appraisal rights to nonvoting shareholders, we decline to rewrite the articles of incorporation to bestow such rights on shareholders not entitled to vote on a disposition of assets.

---

[100] See *Bauers v. City of Lincoln*, 255 Neb. 572, 586 N.W.2d 452 (1998).

[101] See 1 Cox & Hazen, *supra* note 28, § 3:11.

[102] *Labenz v. Labenz*, 291 Neb. 455, 866 N.W.2d 88 (2015).

[103] See *D&M Roofing & Siding v. Distribution, Inc., supra* note 12.

[104] § 21-2,172(a)(5).

#### 4. Streck as Sole Party Liable

The Foundation and the Ryan Defendants argue that the court erred in determining that Streck was the sole party liable for payment of fair value of Streck shares. They highlight that Streck was dissolved in December 2023, and the Ryan Defendants suggest that no party is left to satisfy the anticipated judgment.

This argument overlooks Streck LLC. Contrary to the Ryan Defendants' argument, the court did not dismiss Streck LLC. And there is no dispute that Streck LLC assumed Streck's liabilities. The counterclaims and third-party complaints even assert: "Streck LLC is the successor in interest to Streck . . . , the continuum of its enterprises, and its surrogate and alter ego. Streck, LLC is liable for all sums due from Streck . . . and is added as a party for this purpose."

The Foundation argues that the circumstances allow it to name the interested persons who benefited from the interested transaction as defendants, to pierce the transaction, and to "compel the persons or entities that shelled Streck to restore sufficient assets to pay the Court's fair valuation judgment."[105] But because Streck LLC remains a party to the litigation, piercing the veil is unwarranted.

### VI. CONCLUSION

For the reasons provided above, we conclude the following:

- Because the transaction at issue was a disposition of assets and only Class A shareholders were entitled to vote on the disposition, only Class A shareholders were entitled to appraisal rights for the transaction under the plain language of § 21-2,172(a)(3).
- Although the disposition of assets was an interested transaction, provisions in § 21-2,172(a)(3) and (b)(4) that mention "an interested transaction" do not apply under the circumstances.
- Articles of incorporation that both fail to mention appraisal rights and expressly deprive a class of stock of the right to

---

[105] Brief for appellants at 38.

vote do not "provide[]" for appraisal rights as contemplated in § 21-2,172(a)(5).
• Because the articles of incorporation do not expressly give Class B shareholders appraisal rights or the right to vote on a disposition of assets, Class B shareholders do not have such rights under § 21-2,172(a)(5).

Accordingly, we affirm the district court's partial summary judgment. Upon issuance of our mandate, the cause will return to the district court to resolve the remaining issues.

Affirmed.

Funke, C.J., and Miller-Lerman, J., not participating.

Papik, J., dissenting.

Although I agree with the majority that we have appellate jurisdiction and that declaratory judgment was an available remedy, I disagree with the majority's conclusion that the Class B shareholders do not have appraisal rights, and therefore dissent.

Under Neb. Rev. Stat. § 21-2,172(a)(5) (Reissue 2022), shareholders have appraisal rights "to the extent provided by the articles of incorporation." I understand Streck's articles of incorporation to grant appraisal rights to Class B shareholders. I will first address why I understand the articles of incorporation to grant appraisal rights and then go on to explain why I am not persuaded by the majority's conclusion otherwise.

Streck's articles of incorporation state, "Except for the right to vote, all of the rights and preferences of the Class A voting shares and the Class B non-voting shares shall be *identical*" (emphasis supplied). No one in this case appears to dispute that the plain meaning of the word "identical" in this context would be something along the lines of "exactly alike." See The New Oxford American Dictionary 844 (2001). In my view, it follows that the articles of incorporation confer *every right held by Class A shareholders* (except voting rights) to Class B shareholders. And so, if Class A shareholders have appraisal rights—and everyone agrees they do—and appraisal rights are

not voting rights—and no one contends otherwise—the articles of incorporation "provide[]" appraisal rights to Class B shareholders. See § 21-2,172(a)(5).

The existence of the voting rights exception in the articles of incorporation is only further support for the conclusion that appraisal rights are provided to Class B shareholders. That exception leaves no doubt that Class B shareholders do not have voting rights, but it provides additional confirmation they possess all other rights held by Class A shareholders. As the majority observes, standard rules of contract interpretation apply to articles of incorporation. We have applied the principle of expressio unius est exclusio alterius (the expression of one thing is the exclusion of the others) when interpreting contracts. See, e.g., *Timberlake v. Douglas County*, 291 Neb. 387, 865 N.W.2d 788 (2015). That principle suggests that because the articles of incorporation include a specific exception for, and only for, voting rights, Class B shareholders hold all other rights held by Class A shareholders, and that there are no other exceptions.

The majority concludes that Class B shareholders do not have appraisal rights. It does so by first holding that for articles of incorporation to confer appraisal rights pursuant to § 21-2,172(a)(5), there must be an "express" provision saying as much. In the majority's view, a provision will "expressly" confer appraisal rights only if it clearly or unmistakably does so. The majority then finds that there is no such "express" provision in Streck's articles. I disagree with the holding that § 21-2,172(a)(5) imposes a heightened-clarity requirement to confer appraisal rights. But even assuming it does, I also cannot agree with the conclusion that Streck's articles would not meet such a requirement.

Take first the majority's conclusion that to find a grant of appraisal rights pursuant to § 21-2,172(a)(5), there must be an "express" grant. I do not see any language in § 21-2,172(a)(5) that requires that a conferral of appraisal rights be "express" or "clear." Section 21-2,172(a)(5) does not, for example, provide

that shareholders have appraisal rights "to the extent *expressly* provided by the articles of incorporation" or "to the extent *clearly* provided by the articles of incorporation." It simply says that shareholders have appraisal rights "to the extent *provided* by the articles of incorporation" (emphasis supplied). This language in § 21-2,172(a)(5) suggests to me that courts called to determine whether articles of incorporation confer appraisal rights should follow ordinary rules of interpretation to decide whether appraisal rights have been "provided," rather than imposing any heightened-clarity requirement.

The majority's conclusion that a grant of appraisal rights must be "express" comes not from the statutory language itself, but from a sentence in comments accompanying the Model Business Corporation Act (MBCA). I acknowledge that official comments to a model statute like this can provide guidance in interpreting the statute, but, in my view, the sentence the majority relies on here cannot bear the weight placed upon it. I reprint that sentence below in italics, but also include preceding sentences because I believe they provide helpful context:

> A corporation may voluntarily wish to grant to the holders of one or more of its classes or series of shares appraisal rights in connection with these important transactions whenever the Act does not provide statutory appraisal rights. The grant of appraisal rights may satisfy shareholders who might, in the absence of appraisal rights, seek other remedies. Moreover, in situations where the existence of appraisal rights may otherwise be disputed, the voluntary offer of those rights under this section may avoid litigation. *Obviously, an express grant of voluntary appraisal rights under* [*the MBCA's equivalent to § 21-2,172(a)(5)*] *is intended to override any of the exceptions to the availability of appraisal rights in* [*the MBCA's equivalent to § 21-2,172(a)*].

3 Model Business Corporations Act Ann. § 13.02, official comment at 13-22 (3d ed. 2002) (emphasis supplied).

Just as § 21-2,172(a)(5) does not say that appraisal rights must be "expressly" provided, the sentence from the MBCA comments relied upon by the majority does not either. Instead, it says that when grants of appraisal rights are express, there is an obvious intent to confer appraisal rights even if they would not be conferred by other sections of the MBCA. With the aid of the context provided by the preceding sentences, the sentence appears to merely observe the reality that if appraisal rights are expressly provided, it would make it difficult to impossible for a party to challenge the existence of the appraisal rights in litigation. The majority's reliance on a 2016 revision to those comments also does not move me. The revision largely echoes the earlier comment.

Our familiar principles of statutory interpretation precedents emphasize that it is not "within the province of the courts to read meaning into a statute that is not there." *Sievert v. Alli*, 309 Neb. 246, 255-56, 959 N.W.2d 777, 787 (2021). Because I do not read either § 21-2,172(a)(5) or the comments to the MBCA to state that any grant of appraisal rights must be express, I would not conclude any such requirement exists.

But even if there was a statutory requirement that appraisal rights be "express," I believe such a requirement would be met here. The majority cites Black's Law Dictionary 726 (11th ed. 2019) to state that "express" means "[c]learly and unmistakably." I think there is a clear and unmistakable conferral of appraisal rights to Class B shareholders in the articles of incorporation. To be sure, the articles of incorporation do not specifically mention appraisal rights. But by providing that, with the exception of voting rights, Class B shareholders have rights "identical" to those of Class A shareholders, the articles of incorporation say that every right (other than voting rights) held by Class A shareholders is held by Class B shareholders. Because Class A shareholders undisputedly hold appraisal rights for the transaction at issue here and such rights are not voting rights, it strikes me as clear that Class B shareholders also have appraisal rights. A contrary interpretation results in

either the Class A and B shareholders having something other than "identical" rights or the creation of an unstated exception for appraisal rights in addition to the specific exception for voting rights.

The majority's reliance on *Indiana Farm Bureau Co-op. v. AgMax*, 622 N.E.2d 206 (Ind. App. 1993), does not dissuade me from the conclusion that the articles of incorporation clearly provide appraisal rights to Class B shareholders. In all candor, I have read the section of that opinion the majority relies upon several times, but I am still not sure I understand what it is saying. The Indiana court purports to be analyzing whether the articles of incorporation at issue in that case required "shareholder approval for mergers," but, in its analysis, it does not distinguish between the two types of shareholders in that corporation. *Id*. at 209. To the extent the Indiana court concluded that articles of incorporation can grant rights to shareholders only by specifically mentioning those rights—and not through broad language—I simply disagree. If, as in that case, articles of incorporation grant shareholders the right to vote on "any question or issue coming before the body," *id*., and a merger is a question or issue that comes before the body, it seems obvious to me that the articles have granted shareholders the right to vote on that merger.

The majority appears to have reservations with a reading of the articles of incorporation that would grant appraisal rights to nonvoting shareholders with respect to a transaction in which § 21-2,172(a)(3) grants appraisal rights to only voting shareholders. But that—the provision of appraisal rights beyond the statutory baseline—is exactly what § 21-2,172(a)(5) allows for. Indeed, if § 21-2,172(a)(5) allowed for the conferral of only appraisal rights that were already conferred by other provisions of the NMBCA, that subsection would serve no purpose at all. See, e.g., *Espinoza v. Job Source USA*, 313 Neb. 559, 984 N.W.2d 918 (2023) (courts must attempt to avoid rendering part of statute superfluous). A finding that the articles of incorporation grant appraisal rights to Class B

shareholders does not "annul" § 21-2,172(a)(3); it gives effect to § 21-2,172(a)(5). And, for the reasons I have explained, no "rewriting" of the articles of incorporation is required to conclude that the articles "provide" appraisal rights to Class B shareholders.

Because I understand the articles of incorporation to grant appraisal rights to Class B shareholders, I would reverse the decision below and grant partial summary judgment to the Foundation and the Ryan Defendants on that basis. Because the majority concludes otherwise, I respectfully dissent.

Freudenberg, J., joins in this dissent.